Lori C. Rogich, Esquire
Nevada State Bar No. 12272
ROGICH LAW FIRM, PLLC
11920 Southern Highlands Parkway, Suite 301
Las Vegas, Nevada 89141
702.279.2491
lori@rogichlawfirm.com

Hillary D. Freeman, Esquire*
NJ ID No. 002362006
PA ID No. 200109
FREEMAN LAW OFFICES, LLC
100 Canal Pointe Blvd, Suite 121
Princeton, New Jersey 08540
609.454.5609
hillary@freemanlawoffices.com

Judith A. Gran, Esquire*
PA ID No. 41034
Catherine Merino Reisman, Esquire*
PA ID No. 57473
NJ ID No. 035792000
NY ID No. 5640172
REISMAN CAROLLA GRAN & ZUBA LLP
19 Chestnut Street
Haddonfield, New Jersey 08033
856.354.0071
judith@rcglawoffices.com
catherine@rcglawoffices.com

Jeffrey I. Wasserman, Esquire*
NJ ID No. 037051999
NY ID No. 3046448
Gregory G. Little, Esquire*
NY ID No. 4288544
WASSERMAN LITTLE LLC
1200 Route 22 East, Suite 200, #2238
Bridgewater, New Jersey 08807
973.486.4801
jwasserman@wassermanlittle.com
glittle@wassermanlittle.com

*Attorney will comply with Local Rule IA 11-2
within ten days and petition for Pro Hac Vice admission
Attorneys for Plaintiffs

1

1

2
**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

3
L.W., by and through his Parent and Next
4
Friend, C.W. and C.W., individually;

5
T.L., by and through his Parent and Next Friend,
I.L., and I.L., individually;
6

7
C.R., by and through his Parent and Next Friend,
M.R., and M.R., individually;

8
C.L., by and through his Parent and Next Friend,
9
H.L., and H.L., individually;

10
F.U. and G.U., by and through their Parent and
Next Friend, A.W. and A.W., individually;
11

12
H.P., by and through her Parent and Next
Friend, L.P. and L.P., individually;

13
K.S. and M.S., by and through their Parent and
14
Next Friend, A.S. and A.S., individually;

15
L.B. and E.T., by and through their Parent and
Next Friend, A.B. and A.B., individually;
16

17
Z.A., by and through her Parent and Next
Friend, A.A. and A.A., individually,

18
and on behalf of all others similarly situated,
19
                                                        Plaintiffs,
                        v.
20

21
NEVADA DEPARTMENT OF EDUCATION;

22
JHONE M. EBERT, in her official capacity as
Superintendent of Public Instruction of the
23
Nevada Department of Education;

24
CLARK COUNTY SCHOOL DISTRICT; and

25
DR. BRENDA LARSEN-MITCHELL, in her
official capacity as Interim Superintendent of
26
Clark County School District,

27
                                                        Defendants.

**CLASS ACTION COMPLAINT FOR
INJUNCTIVE AND DECLARATORY
RELIEF**

28

**INTRODUCTION**

1.  The egregious failure of the Nevada Department of Education (NDE) to ensure that Clark County School District (CCSD or District) complies with the Individuals with Disabilities Education Act (IDEA) has thrust children with special needs into an unprecedented crisis. This emergency requires immediate and decisive action. Each day of delay compounds the irreversible harm inflicted on these vulnerable children, robbing them of opportunities that can never be reclaimed.

2.  CCSD is the fifth largest school district in the country, responsible for educating over 300,000 students. CCSD's graduation rates are low and drop-out rates high. CCSD, facing a crippling deficit, has drastically reduced staff, programs and services in recent years, leaving school children in under-resourced, overcrowded classrooms. No one has been hit harder by CCSD's failures than its approximately 40,000-plus students with disabilities.

3.  CCSD has maintained, and is maintaining, district-wide policies that systemically deny students their right to a free and appropriate public education (FAPE) under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (IDEA) and that discriminate against students in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (Section 504), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*. (ADA). With this lawsuit, plaintiffs, on behalf of themselves and others similarly situated, seek to remedy this systemic failure.

4.  Named plaintiffs are current school children with disabilities who are entitled to a FAPE in the least restrictive environment (LRE) from CCSD, but have been denied, delayed, or otherwise deprived of access to a FAPE because of defendants' systemic failures to comply with federal law. CCSD has also systemically discriminated against the named plaintiffs in violation of Section 504 and the ADA.

5.  Defendant Nevada Department of Education (NDE) is legally responsible for ensuring the District's compliance with IDEA. It is imperative that CCSD's public schools be prepared and equipped to provide critical services to students with disabilities. As detailed throughout this complaint, in nearly every area of special education, from preschool through the end of eligibility, NDE has failed to provide the resources, support and oversight essential to ensuring the CCSD public education system meets the needs of this vulnerable population, and the legal requirements of IDEA, Section 504 and the ADA.

6.  If CCSD and NDE continue to deny children in its schools meaningful access to essential education, teachers, staff, programs, and services, their opportunities to contribute to society through productive civic engagement, and to thrive on a personal level, will be permanently foreclosed. These essential resources must include appropriate procedures, training, and services to identify, evaluate, and address disabilities in their formative years. It is impossible to overstate the resoundingly negative, often permanent, effects of the failure to provide meaningful education opportunities to students with disabilities, and to provide them now. Teachers and parents alike are frustrated by the current situation. There are dedicated and diligent educators within CCSD who struggle to perform their jobs adequately due to systemic deficiencies.

7.  CCSD is a symbol in the national consciousness of gross governmental malfeasance and a profound inability of government to promptly respond to the vulnerable population who are the victims of that malfeasance and inaction. Well-resourced, high functioning schools are tools for self-empowerment, upward mobility, and ascendancy from poverty. Their schools must afford them the opportunity to become productive citizens and contributing members of the community, an opportunity they deserve and to which they are entitled. Aggressive measures therefore must be taken immediately to redress the failures of the CCSD public

education system. If not, CCSD will become a national symbol of the irreversible consequences when government at all levels abandons its children.

8.   The named plaintiffs bring this action on behalf of their own children and all similarly situated children in Clark County who have a disability as defined by IDEA and are entitled to the protections of Section 504 and the ADA. Plaintiffs seek to remedy the ongoing violations of IDEA, Section 504, and the ADA by obtaining injunctive relief (1) appointing a federal monitor to restructure the educational system in CCSD; (2) compelling NDE to develop and implement procedures to effect the provision of resources, support and oversight essential to ensuring the CCSD public education system meets the needs of this vulnerable population, and the legal requirements of IDEA, Section 504 and the ADA; (3) compelling CCSD to comply with its clear legal obligations, including, without limitation, the obligation to: (i) identify and evaluate all children with, or at risk of, disabilities who are attending CCSD schools; (ii) provide special education services compliant with students' Individualized Education Programs (IEPs) in the least restrictive environment in CCSD schools; (iii) comply with procedural safeguards when administering discipline to students for disability-related behaviors in CCSD schools; (iv) eliminate physical restraints and seclusion techniques; (v) provide programming that provides for access to and progress in the general education curriculum; and (vi) eliminate disability-based discrimination in violation of Section 504 and the ADA; and (4) compelling NDE and CCSD to ensure that personnel necessary deliver special education services are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities.

**JURISDICTION AND VENUE**

9.   This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, given the federal questions raised, and 28 U.S.C. § 1343(a), given the civil rights claims

raised. This Court also has jurisdiction over the claims raised herein under 20 U.S.C. § 1415(i)(3)(A) and 29 U.S.C. § 794, which provide the district courts of the United States with jurisdiction over any action pursuant to those sections regardless of the amount in controversy.

10. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims asserted occurred within Clark County, which located in the District of Nevada.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

11. As part of its statutory design for achieving its primary purpose of ensuring a FAPE to every child with a disability, 20 U.S.C. § 1400(d)(1)(A), IDEA requires states to provide an opportunity for an impartial due process hearing to adjudicate special education disputes. *See* 20 U.S.C. § 1415(f)-(i). A parent must generally exhaust this due process hearing procedure before filing a lawsuit seeking relief available under the IDEA. Because other federal statutes also bear on students' access to education, the Supreme Court has clarified that exhaustion is required when the gravamen of the complaint is seeking relief for the denial of a FAPE, even if the complaint invokes other laws, such as the ADA or Section 504. *Student A. v. San Francisco Unified Sch. Dist.*, 9 F.4th 1079, 1081-82 (9th Cir. 2021); *see also* 20 U.S.C. § 1415(*l*). However, in certain cases, exhaustion is not required.

12. In this case:

    a. The Nevada Office of Administrative Hearings and State Review Officer do not have jurisdiction of the claims against NDE. Those agencies also cannot award the relief requested here, appointment of a monitor to oversee structural transformation of CCSD's special education system. Thus, exhaustion would be futile.

    b. Plaintiffs are not merely seeking adherence to existing policies, as was the case in *Student A.* Instead, plaintiffs are challenging District-wide policies, including, but not limited to, (i) policy prohibiting general education teachers from referring students for special education evaluations or telling parents that they may seek an evaluation; (ii) policy precluding teachers from identifying dyslexia as a child's disability on an IEP because CCSD does not have services

6

to address that specific learning disability; (iii) policy of failing to sponsor districtwide training to ensure access to research-based intervention; (iv) policy of using the Response to Intervention (RTI) process to delay or deny special education evaluations; (v) policy of allowing insufficiently trained staff to deliver instruction and related services and to assess and evaluate special education students. The existence of these policies results in a systemic failure which exhaustion would not cure and for which structural remedies are required. *See Doe ex rel. Brockhuis v. Arizona Department of Education,* 111 F.3d 678, 682 (9th Cir. 1997). Thus, plaintiffs are requesting structural relief, excusing exhaustion.

c.    The experience of one plaintiff, who has exhausted administrative remedies, illustrates why exhaustion must be excused here. IDEA provides for a state complaint resolution procedure, which can satisfy the administrative exhaustion requirement. *Student A.,* 9 F.4th at 1082. Plaintiff L.P. pursued the state procedure on behalf of her daughter H.P.[1] during the 2023-24 school year. The complaint investigation concluded CCSD committed numerous procedural and substantive violations of IDEA and awarded relief. However, during the current school year, because of the policies set forth above, and the lack of trained staff and resources, CCSD is committing the same procedural and substantive violations as it committed last year. Exhaustion of administrative remedies is futile because the any prospective remedy can only be provided by restructuring the entire system. *See Doe,* 111 F.3d at 682.

## PARTIES

**Representative Plaintiffs**

13. Plaintiff L.W. is eleven years old, resides in Clark County, and is a student in the sixth grade attending a CCSD school. He sues by his mother and next friend C.W., who is also suing individually.

14. Plaintiff T.L. is eight years old, resides in Clark County, and is a student in the third grade attending a CCSD school. He sues by his mother and next friend I.L., who is also suing individually.

---

[1] Pursuant to Local Rule IC-6.1(a)(2), this Complaint identifies minor children by their intitials.

15. Plaintiff C.R. is seventeen years old, resides in Clark County, and is a student in the eleventh grade attending a CCSD school. He sues by his mother and next friend M.R., who is also suing individually.

16. Plaintiff C.L. is six years old, resides in Clark County, and is a student in the first grade attending a CCSD school. He sues by his mother and next friend, H.L., who is also suing individually.

17. Plaintiff F.U. is twelve years old, resides in Clark County, and is a student in middle school attending a CCSD school. He sues by his mother and next friend A.W., who is also suing individually.

18. Plaintiff G.U. is ten years old, resides in Clark County, and is a student in the fifth grade attending a CCSD school. She sues by her mother and next friend A.W., who is also suing individually.

19. Plaintiff H.P. is six years old, resides in Clark County, and is a student in the first grade attending a CCSD school. She sues by her mother and next friend L.P., who is also suing individually.

20. Plaintiff K.S. is six years old, resides in Clark County, and is a student in the first grade attending a CCSD school. She sues by her mother and next friend A.S., who is also suing individually.

21. Plaintiff M.S. is nine years old, resides in Clark County and is a student attending a CCSD school. He sues by his mother and next friend, A.S., who is also suing individually.

22. Plaintiff L.B. is eight years old, resides in Clark County, and is a student in the third grade attending a CCSD school. He sues by his mother and next friend A.B., who is also suing individually.

23. Plaintiff E.T. is fifteen years old, resides in Clark County, and is a student in the tenth grade attending a CCSD school. He sues by his mother and next friend A.B., who is also suing individually.

24. Plaintiff Z.A. is fourteen years old, resides in Clark County, and attends a private school at her parents' expense. She sues by her mother and next friend A.A., who is also suing individually.

**Defendants**

25. Defendant NDE is the department of the State of Nevada responsible for administering and enforcing laws related to public education. As Nevada's state educational agency (SEA), NDE bears the responsibility for ensuring that all public schools in Nevada comply with IDEA. 20 U.S.C. § 1412(a)(11)(A). NDE is also a "program or activity" covered by Section 504, 20 U.S.C. § 794(b), and is a "public entity" under Title II, 42 U.S.C. § 12131(1)(A).

26. Defendant Jhone M. Ebert is the Superintendent of Public Instruction of Nevada and is sued in her official capacity. As Superintendent of Public Instruction, she is charged with directing and supervising all matters pertaining to instructions in all public schools in Nevada. Ms. Ebert serves as the chief executive of NDE, Nevada's SEA.

27. Defendant CCSD is a public school district in Nevada, required under state and federal law to provide special education programs and services. CCSD is a local educational agency (LEA) under IDEA, responsible for ensuring that its special education policies, procedures and programs are consistent with those of the SEA under IDEA. 20 U.S.C. § 1414(a)(1). CCSD is also a "program or activity" covered by Section 504, 20 U.S.C. § 794(b), and is a "public entity" under Title II, 42 U.S.C. § 12131(1)(A).

28. Defendant Dr. Brenda Larsen-Mitchell is the Interim Superintendent of CCSD and is sued in her official capacity.  As the Interim Superintendent of CCSD, she is responsible for ensuring CCSD's compliance with IDEA, Section 504, and the ADA.

## STATUTORY BACKGROUND

**IDEA REQUIREMENTS**

29. Under the IDEA, each state must "ensure" that it provides "special education" and "related services" to all children with disabilities aged three to twenty-two residing in the state. 20 U.S.C. §§ 1401(9), 1412(a)(1).

30. Special education means specially designed instruction that meets the unique needs of a child with a disability. *See* 20 U.S.C. § 1401(29).

31. Related services mean the supportive services "required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26).

32. The State directs local school districts to provide special education and related services to each eligible student with a disability by implementing an "individualized education program," which is an individually tailored education program that is developed, reviewed, and revised by an "IEP team." *See* 20 U.S.C. § 1414(d).

33. The IDEA further requires states to "ensure" that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes . . . cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5).

34. Together, these requirements are commonly referred to as the State's duty to provide students a free appropriate public education in the least restrictive environment. Indeed, as the

state educational agency for Nevada, NDE is specifically "responsible for ensuring that" all eligible Nevada children with disabilities receive a free appropriate public education in the least restrictive environment. 20 U.S.C. §§ 1412(a)(11)(A), (a)(1), (a)(5). NDE must coordinate with other public agencies as needed to ensure that children with disabilities receive the education to which they are entitled under the IDEA. *See* 20 U.S.C. § 1412(12).

35. To fulfill these responsibilities, the State, among other things, must engage in "effective monitoring" to ensure that local school districts, like CCSD, provide a free appropriate public education in the least restrictive environment to all eligible children. *See* 20 U.S.C. §§ 1416(a)(1)(C), (a)(3)(A), (a)(3)(B). While the State must use data to measure school districts' performance, maintain an administrative complaint process,[2] and take corrective action upon finding any violations of the Act, *see* 20 U.S.C. §§ 1411(e)(2)(B)(i), 1415, 1416(a)(3), its duty requires far more.

36. Rather than focusing on technical compliance, the State's "primary focus" must be on "improving educational results and functional outcomes for all children with disabilities." 20 U.S.C. § 1416(a)(2)(A).[3] The State must ensure that students actually receive a free appropriate public education in the least restrictive environment. *See* 20 U.S.C. §§ 1412(a)(1), (a)(5); 1416(a)(1)(C), (a)(3)(A).

37. Accordingly, the State must now guarantee that districts meet the "markedly more demanding" standard for a free appropriate public education, as clarified by the Supreme Court in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386 (2017) which explicitly

---

[2] Under IDEA, a state's administrative complaint processes must allow the filing of (a) a "due process" complaint specific to an individual child, and (b) a "state complaint," which any organization or individual may file alleging violations of the IDEA and that need not relate to a specific child. *See* 34 C.F.R. §§ 300.153, 300.507.

[3] *See also* U.S. Dep't of Educ., *Dear Colleague Letter to Chief State School Officers on Results-Driven Accountability* (May 21, 2014), https://www2.ed.gov/about/offices/list/osers/osep/rda/050914rda-lette-to-chiefs-final.pdf.

demands that every child with a disability receive an "ambitious" education, with the chance to meet "challenging objectives," and anticipates that most children can do so in the general education classroom.

38. IDEA imposes the following requirements:

a. Defendants must have in effect policies and procedures to ensure that all children with disabilities who are in need of special education and related services, including those attending private schools, are identified, located, and evaluated. 20 U.S.C. §§ 1412(a)(3), (a)(7), 1414(a)-(c); 34 C.F.R. §§ 300.111, 300.301, 300.304-306. Under Nevada law, the initial evaluation of the child must be conducted within forty-five school days of receiving parental consent for the evaluation. NAC 388.337(1)(a); 20 U.S.C. § 1414(a)(1)(C)(i)(I); 34 C.F.R. § 300.301(c)(1).

b. Defendants must also ensure that any personnel responsible for administering or interpreting an assessment to determine eligibility or special education needs must possess a license or certificate in the area of the person's professional discipline and be trained in the area of assessment in question. NAC 388.330.

c. When an LEA uses targeted scientific, research-based intervention in an attempt to remediate an academic or behavioral difficulty – RTI – the LEA must provide a copy of the intervention plan to the parents and notify the parents of the right to request an evaluation to determine whether the pupil is eligible for special education and related services. NAC 388.325(2), (3).

d. Defendants must also ensure that an IEP is developed, reviewed, and revised for each child with a disability to enable the child to receive a FAPE. 20 U.S.C. §§ 1412(a)(4), 1414(d); 34 C.F.R. §§ 300.112, 300.320-300.324. An IEP is a written statement that must include, *inter alia*, a statement of the student's present levels of academic achievement and functional performance, measurable annual goals, and the special education and related services that will be provided. 20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.320(a). The LEA must conduct a meeting to develop an IEP within thirty days of a determination that the child needs special education and related services. 34 C.F.R. § 300.323(c)(1). The IEP Team consists of a) the parents of the child; b) the child, where appropriate; c) at least one regular education teacher; d) at least one special education teacher, or if appropriate, at least one special education provider; e) a representative of the LEA who is qualified to provide or supervise the provision of specially designed instruction for children with disabilities and is knowledgeable about the general curriculum and the availability of LEA resources; f) an individual who can interpret the instructional implications of evaluation results, who may already be a member of the team; and g) at the discretion of the parent or agency, other individuals

with knowledge or special expertise regarding the child, including related services personnel. 20 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.321(a).

e.   As soon as possible following development of the IEP, the SEA and LEAs must ensure that special education and related services are made available to the child in accordance with the IEP. 34 C.F.R. § 300.323(c)(2).

f.   Defendants must afford the procedural safeguards required by IDEA when contemplating disciplinary action. 20 U.S.C. §§ 1412(a)(6)(A), 1415(k); 34 C.F.R. §§ 300.150, 300.500, 300.530-536. Pursuant to IDEA, the SEA must examine data to determine if significant discrepancies exist in the rates of long-term suspensions and expulsions of children with disabilities, either between different LEAs or between disabled and nondisabled students within the same LEA. 20 U.S.C. § 1412(a)(22)(A); 34 C.F.R. § 300.170(a). If such discrepancies exist, the SEA must review and, if appropriate, revise (or require the affected LEA to revise) its policies, procedures, and practices relating to the development and implementation of IEPs, the use of positive behavioral interventions and supports, and procedural safeguards, to ensure compliance with IDEA. 20 U.S.C. § 1412(a)(22)(B); 34 C.F.R. § 300.107(b).

g.   A key aspect of IDEA is to ensure that every student has access to and makes progress in the general education curriculum. 20 U.S.C. § 1400(c).

**ADA AND SECTION 504 REQUIREMENTS**

39. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see* 28 C.F.R. § 35.130. Title II requires that public schools provide children with disabilities an equal educational opportunity. *See* 28 C.F.R. § 35.130(b)(1)(ii).

40. The ADA also prohibits the unnecessary segregation of individuals with disabilities and requires public entities to administer their services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *See Olmstead v. L.C.*, 527 U.S. 581 (1999) (interpreting Title II); *see also* 28 C.F.R. § 35.130(d).

41. Public entities must make reasonable modifications to their policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless the

modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7).

42. Section 504 requires entities that receive federal financial assistance to provide aids, benefits, and services to individuals with disabilities in the most integrated setting appropriate to the individual's needs. 34 C.F.R. § 104.4(b)(2).

43. Section 504 also requires covered entities to provide children with disabilities a free appropriate public education, often implemented through an individualized "Section 504 plan." A free appropriate public education under Section 504 means special education and related aids and services designed to meet the needs of children with disabilities as adequately as the needs of nondisabled children are met. *See* 34 C.F.R. § 104.33(a), (b)(1). This requirement is similar to the IDEA requirement to provide a FAPE but, "unlike FAPE under the IDEA, FAPE under § 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of a child's educational program." *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (9th Cir. 2008). Nonetheless, implementation of an IEP developed in accordance with the IDEA is one means of meeting Section 504's requirement. *See* 34 C.F.R. § 104.33(b)(2).

44. Both the ADA and Section 504 prohibit states from discriminating when providing educational services, programs, and activities to children with disabilities, whether a state does so directly or through other arrangements. *See* 28 C.F.R. § 35.130(b)(1); 34 C.F.R. § 104.4(b)(1). Further, states may not provide educational services or administer their educational programs in a way that results in, aids, or perpetuates discrimination against children with disabilities. *See* 28 C.F.R. § 35.130(b)(1)(v), (b)(3); 34 C.F.R. § 104.4(b)(1)(v), (b)(4). The State of Nevada therefore must adequately supervise the school districts that carry

14

out its educational programs to ensure that students with disabilities are not subjected to discrimination.

45. The ADA and Section 504 can require provision of research-based interventions as reasonable accommodations for students who need those interventions to access their educational programming. The failure to provide such research-based interventions when necessary as a reasonable accommodation is unlawful discrimination. *See Rogich v. Clark Cnty. Sch. Dist.*, No. 2:17-cv-01541-RFB-NJK, 2021 U.S. Dist. LEXIS 197135 (D. Nev. Oct. 12, 2021).

## FACTUAL ALLEGATIONS

*CCSD Policies Preclude Compliance with IDEA, Section 504, and the ADAs and Result in Denial of Access to Educational Programming*

46. In 2019, CCSD commissioned a review of special education services by the Council of Great City Schools (*CGCS Review*), available at https://bit.ly/cgcscc. That review identified an assortment of systemic deficiencies. Interviews with parents, teachers, and community leaders reveal that the systemic concerns identified in the *CGCS Review* not only continue to persist today, but have grown worse, including, but not limited to, the following issues:

    a. CCSD "does not have a professional development program that systemically builds the capacity of its people to improve outcomes for students with disabilities. The problem is exacerbated by the fact that the district does not have the staffing levels that other big-city school systems have and there are significant vacancies in almost all staffing areas. Some of this is solvable by how the district contracts for services, but much of it is attributable to unusually weak state funding of the school district. Moreover, the district does not have a clear monitoring or accountability system for special education. And its data dashboard system does not seem capable of tracking the use of interventions or the progress of individual students in the ways one sees in other systems." *CGCS Review* at p.13 of 244.

    b. "School district data also showed that students with disabilities in Clark County were educated in general education classes at a much lower rate than

15

others. Conversely, students with disabilities were more likely to be isolated. They were also more likely to be suspended out-of-school more often than students without IEPs. And the system exceeded the federal 1 percent threshold for alternative testing." *CGCS Review* at p.13 of 244.

c.  CCSD has had about 1,500 students per year hospitalized in a mental health treatment facility, with many having been admitted from two to seven times. Some 26% of hospitalized students have an IEP. *CGCS Review* at p. 23 of 244.

d.  CCSD "does not have any districtwide-sponsored interventions that would ensure all students have access to the research-based instruction necessary to meet their needs." *CGCS Review* at p. 36 of 244.

e.  "The letter to parents of students in grades three through five who are reading below grade level provides vague information about students' needs and the interventions that will be provided to meet those needs. Also, the information does not address whether the student has an IEP and how the provision of reading interventions relates to this instruction. In addition, it does not describe for English learners how a student's language acquisition and reading instruction will interact." *CGCS Review* at p. 37 of 244.

f.  "The faithful implementation of [Multi-Tiered Systems of Support (MTSS )] has enormous implications for school-based multidisciplinary teams in determining whether a student has a disability and needs special education. For instance, to be eligible for special education under the category of [specific learning disability (SLD)],[4] which constitutes more than half of all CCSD students with disabilities, documentation should show that a student received at least eight weeks of intensive interventions that did not produce satisfactory reading improvement. It is estimated that 85 percent of students with SLD have dyslexia. Using the MTSS framework, Nevada has established legal requirements for dyslexia screening and assessment of students from kindergarten through grade 3, and for the provision of instructional interventions for students with dyslexic characteristics. These requirements, as well as specified dyslexia training for literacy specialists and others, are closely aligned with the state's Read by Grade 3 initiative. The state's Dyslexia Resource Guide provides research-based descriptions of effective Tier I core instruction, as well as intensive interventions that are specific and include a multisensory reading approach. Neither the district's Kindergarten-Fifth Grade Literacy Plan nor the 2019-20 Read by Grade 3 professional learning sessions for literacy specialists mention dyslexia or refer to any of the state's guidance in this area. For a student with dyslexia characteristics reading below grade level, only when taught with high quality reading instruction and supplemental

---

[4] "Specific learning disability means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia." 34 C.F.R. § 300.8(c)(10)(i); NAC 388.117.

research-based interventions aligned with student needs – implemented with fidelity – is it possible to accurately determine whether a student's limited response to instruction is determinative of a disability/need for special education or is the result of the failure of adults to carry out their responsibilities." *CGCS Review* at p. 38-39 of 244.

g. "Participants cited poor instruction in the early grades as leading to students needing special education. When students need foundational skills in middle school, teachers are not prepared or skilled enough to intervene. This same concern also applies to English learners. With a lack of viable alternatives, parents seek evaluations for special education, hoping that specially designed instruction will meet their children's needs." *CGCS Review* at p. 56 of 244.

h. "Another critical issue that affects the achievement of students receiving special education is their time out of school due to suspensions and/or unexcused absences. In both areas, students with IEPs were missing time in school at rates higher than their nondisabled peers, and Black/African American students (with and without disabilities) were missing school due to suspensions at rates higher than other racial/ethnic groups." *CGCS Review* at p. 78 of 244.

i. "The absence of rigorous 'first instruction' by both general and special educators – including increasingly intensive supplementary interventions – makes it more difficult for students with disabilities to read in accordance with expected standards." *CGCS Review* at p. 96 of 244.

j. "Moreover, the more a student falls behind in reading, the more likely the student will receive special education outside of the general education classroom. In Clark County, 54 percent of students with IEPs are educated 80 percent of the time in general education, compared to 72 percent at the national level; and 9 percent of CCSD students are educated outside of general education classes more than 60 percent of the time, compared to 5 percent of the nation's students." *CGCS Review* at p. 97 of 244.

k. "The Read by Grade 3 statute allows a student with an IEP to receive intensive reading services *by the same teacher who provided such services during the preceding school year if the teacher has been determined to be highly effective, as determined by student performance data and performance evaluations.* The Council team is not aware of a process in place whereby a preceding school year teacher is assessed based on the statute's highly effective standard. Furthermore, as discussed in more detail below, CCSD has a high number of special educator vacancies." *CGCS Review* at p. 97 of 244.

l. "The Council team asked for written information about the district's sponsorship of any curricular materials for students with IEPs who are reading two or more years below grade level, quality monitoring, and other information that might be useful to the team. The district's response simply stated that CCSD does not sponsor any curricular material for students with IEPs." *CGCS Review* at p. 97 of 244.

17

m. "Discussions with focus group participants did not yield information on the systemic use of multisensory reading instruction or Tier II/III interventions aligned with the Dyslexia Resource Guide or state legislation. Furthermore, CCSD literacy specialists inconsistently work with teachers of students with IEPs. Special education coordinators and other staff members working under each regional special education coordinator to support schools have varied roles and backgrounds. Many do not have a reading background or expertise in this area." *CGCS Review* at p. 98 of 244.

n. CCSD continues to have a high number/percentages of vacant special education positions. Special educator shortages lead to large numbers of teachers working under alternative licensing. *CGCS Review* at p. 100 of 244.

o. "Core curricular materials are not always shared with special educators, including resource teachers who teach reading to students with IEPs. Also, all special educators for students with a specific learning disability who are taught in separate classrooms do not receive core instructional materials." *CGCS Review* at p. 101 of 244.

p. "The congruence of the above factors creates a CCSD culture that makes it very difficult to embrace inclusivity for students with disabilities, and to create environments within general education classrooms in every school for them to be well taught by general educators and receive supplemental instruction by special educators and paraprofessionals who can support them. As a result, there is a tendency for more students to be educated in separate classrooms by teachers who are not well prepared to address their significant learning needs. Thirty percent of these teaching positions are vacant; there is an overreliance on long-term substitutes; many special educators have alternative certifications; and substitute teachers are not consistently available. There is also a shortage of paraprofessionals and substitutes. Teachers are further affected by insufficient access to professional learning. With the additional factor of general education class sizes that are exceptionally large, it is not only difficult to educate students with identified learning challenges who are placed in general education classrooms but to think about adding new students. Equity issues surface when fewer students with IEPs attend magnet schools, and accelerated classes such as Advanced Placement have small class sizes and limited access. Master scheduling difficulties and the availability of core instructional materials further affect CCSD's improvement and ability to provide instruction for students with disabilities within general education settings." *CGCS Review* at p. 101 of 244.

q. "Teachers of self-contained classes have students from many grades, making it very difficult to address core content knowledge relevant to each." *CGCS Review* at p. 104 of 244.

r. "There were examples of self-contained class sizes that were above state standards. This makes it especially hard when student's toileting, privacy, and physical mobility are issues." *CGCS Review* at p. 104 of 244.

18

s. "Focus group participants indicated that no structured models were in place to support the language acquisition needs of English learners with IEPs, and there appeared to be a need for training and materials to addresses this complex issue." *CGCS Review* at p. 107 of 244.

t. "There are concerns that students with emotionally challenged behavior are detrimental to the safety of other students with low cognition or with autism who become targets. Staffing shortages exacerbate these conditions and has created an untenable school environment." *CGCS Review* at p. 108 of 244.

u. One school shared data showing that the number of students with autism transitioning to regular schools tripled since 2016-17 with the inception of the school's transition initiative. However, in many cases, students who left for self-contained classes in regular schools have returned to special schools because regular schools had issues related to personnel shortages and long-term substitutes. *CGCS Review* at p. 108 of 244.

v. "Multiple systemic issues affect student receipt of high quality and effective inclusive instruction: insufficient leadership knowledge and oversight; inadequate support for co-teaching; large class size/caseloads; teacher and paraprofessional vacancies; overreliance on alternatively certified/licensed special educators and long-term substitutes that disproportionately affect some schools more than others; optional and insufficient professional learning for general and special educators; lack of scheduled time for collaboration; inadequate scheduling practices; and unavailable core materials." *CGCS Review* at p. 119 of 244.

47. CCSD maintains policies and practices that purposely interfere with the location and identification of students who need special education services under IDEA. At annual training sessions, for example, CCSD specifically instructs general education teachers not to tell parents that their children may need evaluation for special education services. That policy alone violates a fundamental tenet of the IDEA's "child find" requirement.

48. As a matter of policy, CCSD fails to provide reasonable accommodations for students with dyslexia. Dyslexia is "a neurological learning disability characterized by difficulties with accurate and fluent word recognition and poor spelling and decoding abilities that typically result from a deficit in the phonological component of language." NRS 388.417(2). CCSD maintains a district-wide policy of denying reasonable accommodations to students with dyslexia, as follows:

a.  Despite estimates that 80-90% of students with learning disabilities have dyslexia, bit.ly/faqdyslexia, CCSD, as a policy, pretends that it does not exist.

b.  Astoundingly, as of 2020, CCSD's Kindergarten-Fifth Grade Literacy Plan did not even mention dyslexia and its related requirements for screening, assessment and intervention, including the value of multisensory instruction. Further, none of CCSD's professional learning sessions for literacy specialists described contents specifically related to English learners, students with IEPs, or dyslexia.  In other words, CCSD treated this statistically high percentage of children with disabilities as if they did not even exist.  CCSD certainly has not provided instructional practices for children with dyslexia that aligns with the state's Dyslexia Resource Guide.

c.  There is no indication that these deficiencies have improved with time. As recently as September 2024, CCSD personnel told a class representative that her son's IEP could not indicate that he has dyslexia because the District does not have the resources to address dyslexia.

d.  CCSD does not have trained literacy specialists in all of its schools who can identify dyslexia.

e.  Nevada MTSS framework identified three assessments that districts could use to ensure interventions and practices were implemented with fidelity. CCSD has a policy of not using these or any other comprehensive assessments with any fidelity.

f.  CCSD's continued failures specific to dyslexia are all the more confounding in light of this Court's decision in *Rogich v. Clark Cnty. Sch. Dist.*, No. 2:17-cv-01541-RFB-NJK, 2021 U.S. Dist. LEXIS 197135 (D. Nev. Oct. 12, 2021). In *Rogich*, this Court held that the failure to provide research-based literacy instruction to a student with dyslexia constituted a denial of reasonable accommodations in violation of Section 504 and the ADA. Moreover, because CCSD personnel were aware that a student with dyslexia would be deprived of educational opportunity without this programming, the record established that the failure to provide research-based instruction amounted to deliberate indifference.

49. As a matter of policy, CCSD fails to provide reasonable accommodations for students with behavioral management needs and/or autism, as follows:

a.  Staff are not trained to implement research-based instruction using the principles of Applied Behavioral Analysis (ABA).

b.  Staff are not trained in methods to increase motivation for learning.

c.  Staff are not trained to conduct appropriate Functional Behavior Assessments (FBAs) in order to prepare appropriate Behavior Intervention Plans (BIPs).

20

d.  For students with autism, current academic goals do not appear to be based on an assessment tool designed for students who have been severely impacted by autism.

e.  Ample research establishes that teaching individuals to communicate reduces behaviors. Despite this research, CCSD maintains a policy of failing to identify communication needs, teach skills to communicate effectively, or even give an appropriate form of communication (whether technology or otherwise).

f.  Students with autism require a more consistent and individualized approach to their education, focusing on meaningful skill acquisition and generalization rather than rote memorization. CCSD does not provide trained staff who can teach in this manner.

50. CCSD's district-wide policy of not providing effective, research-based behavioral supports results in disproportionate disciplinary exclusions and unnecessary segregated placements.

51. CCSD has a policy of failing to provide appropriate supports to ensure that children are educated in the LRE.

a.  CCSD does not provide sufficient trained staff to support education in inclusive settings.

b.  CCSD does not provide research-based supports to facilitate inclusion in the general education setting. Instead of providing appropriate supports, CCSD's policy is to send or return students with disabilities to special education schools.

c.  In 2020, the CGCS report indicated that CCSD's ineffective inclusive instruction "***should be thought of as a crisis***." (emphasis added) CCSD's policy in response to the crisis was to ignore it, so the situation is more appalling now than it was in 2020.

d.  CCSD maintains a policy of failing to provide access to supplementary aids and services to support education in the least restrictive environment.

52. CCSD maintains a district-wide policy of ignoring staffing shortages and disproportionately using long-term substitutes, non-certified staff, and paraprofessionals to provide services to students with disabilities, resulting in a denial of FAPE and a lack of access to the least restrictive environment.  Indeed, prior to the start of the 2024-2025 school year, "the Clark County School District says they have 1,078 vacancies."

https://www.fox5vegas.com/2024/08/01/nevada-colleges-not-producing-enough-teachers-keep-up-with-demand-ccsd-sees-1000-vacancies-ahead-school-year/ (Published: Jul. 31, 2024 at 9:01 PM EDT).  Of those, CCSD reported that more than 100 openings remained for special education teachers.  *Id.*  For the prior school year, "Superintendent Jesus Jara said last month the number of teacher vacancies sat at around 1,100, but the union estimates that it is now nearing 2,000."  https://thenevadaindependent.com/article/clark-county-schools-declare-impasse-call-teacher-union-pay-demands-budget-busting (September 12, 2023 at 2:25 PM). The exodus of CCSD teachers is endemic:

> The Clark County School District is taking action to stop the flow of teachers from exiting the district.  As of February of this year, the district has 1,316 teacher vacancies. CCSD entered the school year with 1,131 openings.  The CCSD Board of Trustees is planning to declare a critical labor shortage with less than 20 school days left.  "It's really upsetting because when you think about it, that means that there are still over 35,000 students without a licensed educator in front of them," Clark County Education Association President Marie Neisess said.  https://www.8newsnow.com/news/local-news/ccsd-plans-to-declare-critical-labor-shortage-amid-1k-teacher-vacancies/ (Posted: Apr 23, 2024 / 05:46 PM PDT; Updated: Apr 23, 2024 / 11:13 PM PDT)).

53. CCSD maintains a district-wide policy of removing staff from classrooms (often because of staffing shortages), thereby leaving special education students without sufficient support in both special education classrooms and general education classrooms.  One news report explains:

> Earlier this month, FOX5 was tipped off by a CCSD special education teacher that she was notified her class size could be increasing. The notice lays out a potential increase for each of the eight special education programs offered within the district.  "They're putting a band-aid over this problem by saying, 'Okay, you can teach ten kids in your autism class now,'" that teacher told FOX5 on the condition of anonymity.  The notice sent by CCSD blames a teacher shortage for the potential increase in class sizes. Another special education teacher, who also spoke anonymously, told FOX5 this means a bigger workload for teachers like her. "It pushes me to the limit," she said. "More things are being added to our plate."  https://www.fox5vegas.com/2023/07/20/more-things-are-being-added-

our-plate-teachers-upset-over-potential-increase-special-education-class-size/ (Jul. 20, 2023 at 1:34 AM EDT).

54. Another news report explains:

> The Clark County School District is dealing with staffing struggles impacting special education students.  One CCSD teacher spoke to Channel 13, saying certain special education support services are being impacted and worries the problem may only worsen for hundreds of students. https://www.ktnv.com/news/education/ccsd-teacher-fears-special-education-needs-are-going-unnoticed-during-pay-issues-contracts (Aug 14, 2023 and last updated 12:17 AM, Aug 15, 2023).

55. That article continues:

> After starting the new school year, she says she noticed some changes to the support services for special education.  Amanda says services such as one for behavior specialists have been impacted due to the ongoing teacher shortage in the district. "They are no longer taking referrals," she said. "It is down to supervisors only, and they can't provide the services to the students." *Id*.

> ***

> She worries about the services for special needs students. Right now, there are more than 1,200 jobs open on the CCSD website, 267 of those are in special education. *Id*.

56. Similar reports abound:

> a. "The Clark County School District is facing a teacher shortage, and it is affecting students with special needs . . . ." https://thenevadaglobe.com/702times/teacher-shortage-affects-students-with-special-needs-in-clark-county-school-district/ (Aug 24, 2023 / 11:26 PM PDT; Updated: Aug 25, 2023 / 08:30 AM PDT).

> b. "Since school started last month, Sills has received calls to pick him up. Despite having a Individualized Education Plan (IEP), the principal informed Sills that Watson Elementary doesn't have enough resources to accommodate her son." *Id*.

> c. "There are currently 320 special education teacher vacancies at CCSD, making up nearly one-fourth of the total vacancies. CCSD Superintendent Dr. Jesus Jara blames the current salary schedule for the shortage, stating that teachers are not being compensated for their years of service or degrees." *Id*.

> d. "Below is a list of the positions with the highest vacancies, according to the district. . . Special Education – 272." https://www.8newsnow.com/news/local-news/ccsd-plans-to-declare-critical-labor-shortage-amid-1k-teacher-vacancies/

(Posted: Apr 23, 2024 / 05:46 PM PDT; Updated: Apr 23, 2024 / 11:13 PM PDT)).

e. "The Clark County School District is hoping retired teachers can help fill some of their 1,000-plus teaching vacancies.  According to data from the district, there are 1,316 teacher vacancies as of February of this year. That includes 389 openings for elementary teachers and 303 for special education professionals." https://www.fox5vegas.com/2024/04/24/clark-county-school-district-hoping-retired-teachers-can-help-fill-1000-teaching-vacancies/ (Published: Apr. 24, 2024 at 6:22 PM EDT).

57. The shortage of appropriately trained teachers no doubt has led to increased incidents of abuse of special education children:

a. "The Clark County School District Board of Trustees agreed to pay a $2 million settlement after a teacher was accused of abusing a child with disabilities." https://www.8newsnow.com/news/local-news/ccsd-approves-2m-settlement-after-teacher-accused-of-abusing-child-with-disabilities/ (Posted: Aug 24, 2023 / 11:26 PM PDT; Updated: Aug 25, 2023 / 08:30 AM PDT).

b. "The Clark County School Board is expected to vote on a settlement of nearly $10 million in a 2018 incident involving an autistic 6-year-old boy who was struck with a stick as punishment for taking off his shoes." https://www.8newsnow.com/news/local-news/ccsd-to-vote-on-9-95-million-settlement-after-autistic-boy-struck-by-teacher-in-2018/ (Nov 2, 2023 / 06:45 PM PDT; Updated: Nov 3, 2023 / 08:08 AM PDT). "A classroom aide told police she saw Carter hit JJ about five times for taking his shoes off and only stopped after the last swing broke the stick. The aide said she recalled the teacher saying, 'I have more of those.'" *Id.*

c. "Clark County School District early childhood and special education teacher is facing charges after being accused of harming autistic students on three separate occasions." https://www.ktnv.com/news/crime/arrest-report-ccsd-teacher-accused-of-abusing-autistic-students-at-elementary-school (Posted 5:08 PM, Mar 20, 2024).

d. "A Clark County School District substitute has been arrested on charges of abusing special needs children." https://www.ktnv.com/news/crime/ccsd-substitute-teacher-arrested-on-charges-of-abusing-special-needs-students (5:53 PM, Mar 25, 2024).

58. CCSD has a district-wide policy of failing to provide appropriate research-based assessments and services related to post-secondary transition.

***Allegations Related to Named Plaintiffs***

59. As set forth in the factual descriptions below, defendants have committed numerous procedural violations under IDEA, which have impeded the named plaintiffs' right to a FAPE, significantly impeded parental opportunity to participate in the decision making process regarding the provision of FAPE, and/or caused a deprivation of educational benefit. *See* 34 C.F.R. § 300.513(a)(2). Those violations include, but are not limited to, the following:

a. **Failure to Identify and Evaluate:** CCSD has not implemented adequate policies and procedures to ensure the timely identification, location, and evaluation of students suspected of having disabilities. In fact, CCSD maintains a policy of purposely not evaluating students suspected to be eligible for special education. This failure violates the "child find" mandate under 20 U.S.C. § 1412(a)(3)(A) and 34 C.F.R. § 300.111, thereby denying students the opportunity to receive necessary special education services.

b. **Inadequate IEPs**: CCSD has failed to develop, review, and revise IEPs in accordance with the requirements of 20 U.S.C. § 1414(d). Many IEPs lack necessary components such as measurable annual goals, statements of the student's present levels of academic achievement, and appropriate accommodations, which are required by 34 C.F.R. § 300.320(a).

c. **Failure to Implement IEPs:** Even when IEPs are developed, CCSD frequently fails to implement them as written. This includes not providing the special education and related services specified in the IEPs, in violation of 34 C.F.R. § 300.323(c)(2).

d. **Denial of Parental Participation:** CCSD has systematically restricted parental involvement in the development and implementation of IEPs, in violation of 20 U.S.C. § 1414(d)(1)(B) and 34 C.F.R. § 300.322. Parents have been denied meaningful opportunities to participate in meetings regarding their child's educational placement and the provision of FAPE.

e. **Failure to Provide Procedural Safeguards:** CCSD has not consistently provided required procedural safeguards, such as prior written notice and the right to an impartial due process hearing, as mandated by 20 U.S.C. § 1415 and 34 C.F.R. §§ 300.500-300.536.

f. **Inappropriate Disciplinary Actions:** CCSD has failed to conduct manifestation determination reviews before disciplining students for behaviors related to their disabilities, as required under 20 U.S.C. § 1415(k)(1)(E) and 34 C.F.R. § 300.530(e).

g. **Failure to Provide Transition Services:** CCSD has neglected to include appropriate measurable postsecondary goals and transition services in IEPs for students aged 16 and older, as required by 20 U.S.C. § 1414(d)(1)(A)(i)(VIII) and 34 C.F.R. § 300.320(b).

h. **Failure to Provide Appropriate Special Education and Related Services and Supplementary Aids and Services in IEP**: Every student's IEP must include a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child (1) to advance appropriately toward attaining the annual goals; (2) to be involved in and make progress in the general education curriculum in accordance with 34 C.F.R. § 300.320(a)(1) and to participate in extracurricular and other nonacademic activities; and (3) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this section. 34 C.F.R. § 300.320(a)(4). CCSD fails to provide IEPs that comply with this mandate.

i. **Failure to Consider Special Factors.** The IEP team must take into account the following special factors in developing the IEP: (1) In the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports and other strategies to address that behavior; (2) In the case of a child with limited English proficiency, consider the language needs of the child as such needs relate to the child's IEP; (3) In the case of a child who is blind or visually impaired, provide for instruction in Braille and the use of Braille unless the IEP team determines, after an evaluation of the child's reading and writing skills, needs, and appropriate reading and writing media (including an evaluation of the child's future needs for instruction in Braille or the use of Braille), that instruction in Braille or the use of Braille is not appropriate for the child; (4) Consider the communication needs of the child, and, in the case of a child who is deaf or hard of hearing, the child's language and communication needs; opportunities for direct communication with peers and professional personnel in the child's language and communication mode; academic level; and full range of needs, including opportunities for direct instruction in the child's language and communication mode; and (5) Consider whether the child needs assistive technology devices and services. 34 C.R.C. § 300.324(a)(2). CCSD routinely fails to consider these special factors.

60. The deprivations of FAPE and discrimination described for each of the named plaintiffs below are directly related to district-wide policies and practices of CCSD outlined in

26

¶¶ 46-58, supra, and result from a systemic failure which exhaustion would not cure and for which structural remedies are required. *Doe*, 111 F.3d at 679.

**L.W.**

61. L.W. is eleven years old and has diagnoses of ADHD, dyslexia, dysgraphia, and suspected dyscalculia. He is currently placed in resource room for writing and reading and spends 85% of the school day in general education.

62. During L.W.'s first five years in CCSD, the District failed to deliver a FAPE, with District personnel admitting that they do not have the resources to provide him the services he needs. CCSD denied L.W. a FAPE and discriminated against him in many ways, including, but not limited to, the following:

> a. **Inadequate Instruction.** L.W. was in first grade (2019-20) when the pandemic shut down his school. His teacher did not check on him or provide any instruction during remote instruction. In second grade (2020-21), his parents had to fight for him to be part of the in-person cohort during the hybrid period.

> b. **Failure to Identify L.W. as a Child in Need of Special Education:** In third grade (2021-22), District personnel told parents that placing L.W. with a teacher who normally had "higher functioning" children in her class would allow L.W. to receive more personal services. However, those services were not provided and L.W. was pushed into fourth grade notwithstanding his failure to make progress. In fourth grade (2022-23), L.W. began suffering from anxiety, resulting in gastrointestinal issues that led to missed educational time. During a parent-teacher conference, C.W. requested pen and paper (as opposed to electronic or digital) assignments to help L.W. with reading, writing, and comprehension. District staff told parents that because L.W. did not have an IEP, they could not grant that request. During the spring semester of fourth grade, his parents requested that the District evaluate L.W.

> c. **Inappropriate Implementation of the IEP.** During the fall semester of fifth grade (2023-24), the District provided L.W. with an IEP. CCSD placed L.W. in a class with a teacher he could not understand. At parental request, CCSD switched his class. L.W. received push-in resource services from an aide who could not pronounce the words in the book she was reading to her small group. He also received inappropriate writing interventions.

> d. **Delay in Responding for Parental Request for Changes to IEP.** In April 2024, parents provided the District with a private evaluation recommending

changes to L.W.'s IEP. CCSD personnel told parents they would reconvene in the beginning of sixth grade.

e.   As a consequence of this denial of FAPE and unlawful discrimination, L.W. made no academic progress in his areas of need.

63. During the 2024-25 school year, CCSD continues to deny L.W. a FAPE and discriminate against him in many ways, including, but not limited to, the following:

a.   **Staff's Lack of Knowledge of the IEP.** On September 3, 2024, at the start of sixth grade, C.W. met with CCSD via Google Meet. At that time, the special education teacher and Special Education Instructional Facilitator told C.W. that they were unaware of L.W.'s diagnoses.

b.   **Pre-Determination and Lack of Research-Based Interventions.** Also during the September 3, 2024 meeting, CCSD personnel told C.W. they could not indicate on L.W.'s IEP that he had dyslexia because they did not have the resources to address dyslexia. Despite the availability of effective research-based interventions, CCSD is unable to implement them due to insufficiently trained staff.

c.   **Flawed Implementation of IEP.** C.W. requested that she be allowed to observe L.W.'s class. During L.W.'s writing block, C.W. observed the class play a virtual game that required no writing at all. L.W., who has ADHD, was seated next to a child who continuously banged a small gavel on the table. Another child repeatedly wandered in and out of the room. At no time did C.W. observe any writing instruction.

d.   **Loss of Instructional Time.** On September 12, 2024, L.W.'s teacher admitted to C.W. and the vice principal that she was removing the children from class to run personal errands and conducting personal appointments over the phone during instructional time.

e.   **Failure to Address Issues at IEP Meeting.** At a September 13, 2024 meeting, the IEP team only got through half of L.W.'s IEP. The school has been unable or unwilling to schedule a meeting to complete revisions to L.W.'s IEP.

f.   As a consequence, L.W.'s IEP is not reasonably calculated to result in educational benefit and is, in fact, not providing educational benefit. Additionally, CCSD continues to deny L.W. reasonable accommodations and discriminate against him.

*T.L.*

28

64. T.L. is eight years old and has Autism Spectrum Disorder. He is currently placed in an intermediate autism classroom. T.L. is minimally verbal. He will repeat what someone says to him, but cannot tell his mother what has happened to him at school.

65. During the 2023-24 school year, CCSD denied T.L. a FAPE and discriminated against him in many ways, including, but not limited to, the following:

a. **Inadequate Instruction**. T.L. was placed in an autism classroom, but the teacher did not have the training to instruct children with autism. Additionally, the classroom was not adequately staffed to meet the needs of the students.

b. **Failure to Provide Appropriate Behavioral Interventions and Ensure Safety.** There are well-documented, research-based interventions to address behavior. T.L. exhibited behaviors of concern, but no behaviorist oversaw T.L.'s program. Rather than evaluating him with an FBA and providing a BIP, the District allowed T.L. to elope from the classroom multiple times per week, sometimes leaving school grounds.[5] T.L. was seven years old at the time. School personnel often did not know where he was. One time, he was two blocks away outside the school gate, crying, with the police standing over him. He did not have the verbal ability to tell the police his name. Lacking trained behaviorists on staff, school personnel actually reinforced the eloping behavior by rewarding T.L. with treats when he returned him to school.

c. **Inappropriate Use of Restraints and Physical Injury**. Rather than proactively attempting to avoid elopement through appropriate behavioral interventions, CCSD personnel reacted to T.L.'s elopement by manhandling him, restraining him, and even, at times, tackling him. District personnel did not provide notice to I.L. when they used restraints on her son. The only time a school employee notified I.L. of the use of restraint was when personnel knew that another parent had a video of T.L. being restrained. A school employee called I.L. and told her that she forgot to fill out the restraint form. T.L. had twenty-seven documented head injuries during the 2023-24 school year.

d. **Failure to Provide Appropriate Research-Based Instruction**. There are research-based methods, including ABA, proven to provide effective instruction to children on the autism spectrum. CCSD does not have staff trained in these research-based methods. T.L. regressed during the school year.

---

[5] "Wandering/elopement behaviors in individuals with Autism Spectrum Disorders (ASD) remain a critical issue among all age groups, often leading to significant risk of bodily harm and death." https://nationalautismassociation.org/wp-content/uploads/2017/04/NAAMortalityRiskASDElopement.pdf. "According to data published in 2012 by Pediatrics, 49% of children with an ASD attempt to elope from a safe environment, a rate nearly four times higher than their unaffected siblings." *Id.*

One day, school personnel sent him home with feces in his pants. T.L. did not have those types of accidents before the school year started.

e. **Loss of Instructional Time**. Because CCSD was not even attempting to address T.L.'s behaviors, he was not available for instruction.

f. **Failure to Convene an IEP Meeting to Address Deficiencies in T.L.'s Program.** IDEA requires that a school district review and revise an IEP when there is lack of expected progress toward annual goals. Given the obvious fact that T.L.'s program was not appropriate for T.L., school personnel should have called an IEP meeting to address the deficiencies. The school failed to do so.

g. **Retaliation**. By the end of the school year, I.L. was afraid to send T.L. to school. When she kept him home, CCSD threatened her with truancy charges. I.L. returned him to school despite her fears.

h. As a consequence of this denial of FAPE and unlawful discrimination, T.L. made no progress in his areas of need and, in fact, regressed.

66. T.L. is currently at a new school where he is not experiencing the same difficulties. However, because of the district-wide policies and practices of CCSD outlined in ¶¶ 46-58, *supra*, at any point, T.L..'s situation could change, resulting in a loss of educational benefit. For example, due to staffing shortages, CCSD regularly removes necessary trained personnel from its classrooms. Even the best teachers are unable to comply with students' IEPs in under-resourced classrooms.

*C.R.*

67.  C.R. is seventeen years old, has Usher syndrome[6] resulting in Deafness and visual impairment, Autism Spectrum Disorder, Intellectual Disability, ADHD, Tourette syndrome, and Disruptive Mood Disorder. He is currently placed in a self-contained classroom at Rancho High School. He has limited communication abilities, with some use of sign language, and cannot always tell his mother what has happened to him at school.

---

[6] Usher syndrome is a rare genetic condition that causes both hearing and vision loss. Vision loss is caused by a degenerative eye disease that results in a loss of peripheral vision (tunnel vision) that worsens over time.

68. During his time in the District, CCSD denied C.R. a FAPE and discriminated against him in many ways, including, but not limited to, the following:

a. **Failure to Review and Revise IEP.** C.R. transferred to CCSD when he was in eighth grade, during the pandemic. M.R. provided the District with C.R.'s out-of-state IEP, but the District never held an IEP meeting to update his program.

b. **Failure to Provide Appropriate Behavioral Interventions and Ensure Safety.** There are well-documented, research-based interventions to address behavior. Although C.R. exhibited behaviors of concern, CCSD never had a behaviorist provide appropriate supports. Rather than evaluating him with an FBA and providing a BIP, the District repeatedly punished C.R. for behaviors related to his disability, even sending him to juvenile detention once.

c. **Inappropriate Use of Restraints and Physical Injury**. Rather than proactively providing appropriate behavioral interventions, CCSD personnel reacted to C.R. by manhandling him, restraining him, and handcuffing him. District personnel did not provide legally required notice to M.R. when they used restraints on C.R.

d. **Failure to Provide Appropriate Research-Based Instruction**. There are research-based methods, including ABA, proven to provide effective instruction to children on the autism spectrum. CCSD does not have staff trained in these research-based methods. As a consequence, C.R. has not made progress, and in fact has regressed, during his time in CCSD.

e. **Failure to Provide Communication Device**. CCSD failed to provide assistive technology to address C.R.'s communication needs. C.R. has limited ability to use sign language and, therefore, needs an augmentative communication device. CCSD unreasonably delayed provision of an augmentative communication device.

f. **Unlawful Exclusion from Educational Programming.** CCSD has repeatedly failed to follow appropriate procedures for a manifestation determination, instead disciplining him for behavior that is a manifestation of his disability, resulting in unlawful exclusion from educational programming. One time, CCSD sent C.R. to juvenile detention for behaviors that were a manifestation of his disability. Two other times, the school police gave C.R. a citation to appear in court.

g. **Failure to Provide Appropriate Transition Services**. CCSD has never completed any transition assessment for C.R. Consequently, he is not currently receiving appropriate transition services required by IDEA.

h. **Placing C.R. in a Dangerous Situation Due to Lack of Ability to Communicate**. One day, when CCSD unlawfully excluded C.R. from school, the school police dropped him at an address where he no longer lived. Because

there was no one with him who understood sign language, the school police did not understand when C.R. tried to tell them that he did not live there. The address was about ten miles from C.R.'s then-current home. For hours, M.R. did not know where C.R. was. C.R. was unable to communicate with anyone to get help. Eventually, M.R. found him at a convenience store that was twelve miles from their home and four miles from the address where the school police had left him.

i.   As a consequence of this denial of FAPE and unlawful discrimination, C.R. made no progress in his areas of need and, in fact, regressed.

**C.L.**

69.  C.L. is six years old and has Autism Spectrum Disorder. He is currently placed in a primary autism classroom for the entire day.

70. During the 2023-24 school year, CCSD denied C.L. a FAPE in many ways, including, but not limited to, the following:

a.   **Inadequate Behavioral Support.** Due to the lack of properly trained staff, CCSD did not provide appropriate behavioral supports in C.L.'s kindergarten classroom. The classroom environment was unsafe and chaotic, with children running into the parking lot. C.L. was physically assaulted by his classmates, resulting a significant regression in C.L.'s behavior.

b.   **Failure to Implement IEP**. The District failed to implement all components of C.L.'s IEP, which is essential for educational progress.

c.   **Lack of Research-Based Interventions.** Despite the availability of effective research-based interventions to address behavior concerns, CCSD is unable to implement them due to insufficiently trained staff.

d.   **Lack of Appropriate Staff.** CCSD did not provide a licensed teacher, instead relying on unqualified substitutes and an aide who were left to manage the class alone.

e.   **Denial of Parental Participation.** When H.L. attempted to address her concerns with school administration, rather than addressing the lack of support and accommodation, CCSD personnel inappropriately blamed C.L.

f.   As a consequence of this denial of FAPE, H.P. regressed behaviorally and made minimal academic progress. The situation was so bad that H.L. was compelled to transfer C.L. out of the school prior to the end of the school year.

71. C.L. is currently at a new school where he is not experiencing the same difficulties. However, because of the district-wide policies and practices of CCSD outlined in ¶¶ 46-58, *supra*, at any point, C.L..'s situation could change, resulting in a loss of educational benefit. For example, CCSD regularly removes necessary trained personnel from its classrooms, due to staffing shortages. Even the best teachers are unable to comply with students' IEPs in under-resourced classrooms.

***F.U.***

72. F.U. is twelve years old and has a diagnosis of Autism Spectrum Disorder. His current IEP places him in general education for the entire school day.

73. When F.U. was four years old, he was placed in the special needs pre-kindergarten program at Vanderburg Elementary. At the time, his only diagnosis was Language Disorder. During his time at Vanderburg Elementary, CCSD denied F.U. a FAPE and discriminated against him in many ways, including, but not limited to, the following:

 a. **Inappropriate Placement and Program**. At the IEP meeting for kindergarten, CCSD recommended placement in a Specific Learning Disability (SLD) classroom. The program turned out to be highly inappropriate. F.U.'s private speech therapist and neuropsychologist agreed that he should be placed with general education students as much as possible, rather than removed from the LRE. The IEP prepared for F.U. was far below his abilities. Placement in this inappropriate program turned F.U. from a child who once loved school into a child who kicked, screamed, and collapsed to the ground, requiring his mother to pull him into school. F.U. successfully repeated his kindergarten year in general education with resource support.

 b. **Denial of Parental Participation**. Office staff refused to allow A.W. to have contact with the principal. She had to send a certified letter to the school to be able to communicate with the principal, who did not know that her staff had been denying access to A.W. At one point, the LEA representative told A.W. that if the school team felt that she was not making the right decisions, they could strip away her right to make decisions and ignore her requests. School staff discredited A.W.'s reports of F.U.'s abilities at home. Eventually, A.W. had to refuse all intervention and place him in general education in order to get CCSD to really examine his needs and to begin adding services back to his program to provide appropriately individualized services.

c. **Failure to Appropriately Evaluate at the Beginning of the Year, Resulting in Inappropriate Programming.** At the end of his kindergarten year, the school psychologist said to A.W., "you'll be surprised to know he actually has a high IQ." A.W. was not surprised, as she had been telling the school repeatedly that they were not providing educational programming at F.U.'s level. This statement betrayed a lack of understanding of F.U.'s educational needs.

d. **Failure to Provide Appropriate Behavioral Supports.** When F.U. began to exhibit behaviors of concern, CCSD personnel failed to complete an FBA and develop a BIP until A.W. told them that this would be the appropriate intervention. The initial BIP made the inaccurate assumption that F.U. was not getting enough sleep, rendering the plan inappropriate. Knowing that F.U.'s behaviors could be exacerbated by his failure to finish his lunch on some days, A.W. suggested offering an afternoon snack. District personnel disregarded this request until A.W. presented them with a doctor's prescription. CCSD did not provide F.U.'s general education teacher with any assistance in her class to ensure that F.U. ate his snack. Therefore, the general education teacher had to interrupt teaching to provide this accommodation to F.U.

e. **Failure to Provide Research-Based Supports**. CCSD personnel told A.W. that the school had the ability to meet all his needs. This was not true. The District did not provide ABA services or social skills intervention. The available speech therapy was largely for speech impediments and not comprehensive language disorder. District personnel did not contact the occupational therapist to request support for F.U.'s sensory needs. The therapist provided potential interventions only after A.W. called her directly.

f. **Failure to Provide Supports in the LRE**. When A.W. requested an assistant in the classroom to help F.U., CCSD personnel told her that the District never provides an assistant to help a child integrate into the general education environment.

g. **Failure to Address Bullying.** CCSD provided no interventions to address other students calling F.U. "f'ing garbage," "f'ing trash," and "f'ing loser" because he was not good at sports.

h. As a consequence of this denial of FAPE and unlawful discrimination, F.U. did not make meaningful progress in his areas of need.

74. Currently, F.U. attends middle school and CCSD continues to deny F.U. a FAPE and discriminates against him in many ways, including, but not limited to, the following:

a. **Failure to Address Needs Related to Transition to New School:** When F.U. began middle school, CCSD provided no support for that transition, notwithstanding knowledge that transitions constitute an area of need for F.U.

b. **Failure to Communicate with Parent:** Due to organizational challenges, and especially in a new environment where F.U. is unfamiliar with the online system used by the school, CCSD personnel should be notifying A.W. of poor grades. This year, within the first month of school, F.U. had several missing assignments for which he received zeros. No teacher notified A.W.

c. **Failure to Provide Materials**. CCSD personnel told A.W. that notes for his classes are "in the book" but students at his school are not allowed to bring books home. In addition, they cannot carry a backpack with them or go to their locker except at lunch. If F.U. needs to use books in his classes, he has to carry them, along with his binder, water bottle, and any other materials he needs, in his arms throughout the day. The teachers do not all provide class content and study materials on the Canvas online education platform.

d. **Failure to Provide Appropriate Interventions**. A.W. has to pay for private services in order to ensure that F.U. receives educational benefit.

e. As a consequence of this denial of FAPE and unlawful discrimination, F.U., but for the private interventions provided by his mother, F.U. would not be making meaningful progress.

*G.U.*

75. G.U. is ten years old and has diagnoses of comprehensive language disorder and unspecified anxiety disorder. She attends resource room for math, and her IEP indicates that she is currently placed in general education for 80-100% of the school day.

76. During her time in elementary school, CCSD has denied G.U. a FAPE and discriminated against her in many ways, including, but not limited to, the following:

a. **Inappropriate Placement and Program and Denial of Parent Participation**. A.W. struggled to get G.U. time in the resource room for math for eighteen months. She requested it at parent teacher meetings and IEP meetings. When A.W. requested an IEP meeting to discuss this placement, the resource teacher wrote back that she did not think an IEP meeting was warranted. CCSD scheduled a meeting only after A.W. wrote a lengthy email in response explaining that the language disorder, documented in G.U.'s IEP, affected her ability to do word problems. A.W. further noted that G.U.'s challenges with math were exacerbating her anxiety disorder and causing physical symptoms of illness. Finally, after an unreasonable delay, CCSD provided resource services for math.

b. **Failure to Implement IEP**. This school year, in a response to an email expressing concern about G.U.'s grades, the principal told A.W. that she was

35

not receiving services in the resource room because the school didn't have the staff.

c. **Failure to Address Identified Needs.** G.U. works to mask and hide her comprehensive language disorder. She often says she understands things when she does not. Even when teachers care and want to help, they cannot do so because they do not have the appropriate training to understand and support her deficits in comprehension.

d. **Failure to Provide Materials in a Format That G.U. Can Access**. G.U.'s homework, school work, and tests for math are always on the computer without a paper copy and with no book provided. This requires G.U. to scroll up and down in order to get all the information necessary to respond to math word problems. CCSU personnel denied A.W.'s request that G.U. be provided with paper copies of homework and assessments, stating that all work has to be done on the computer, even if that was interfering with G.U.'s educational access.

e. **Failure to Address Poor Performance and Notify Parent**. When A.W. checked Infinite Campus for G.U.'s grades this year, she found three Ds (65%) in language arts and three near-Ds (70.8%) in math. These grades are not consistent with G.U.'s cognitive potential. However, no teacher attempted to ascertain from G.U. what additional support she might need to ensure educational benefit. Had the District notified A.W., she would have known that G.U. potentially needed more, or different, support.

f. As a consequence of this denial of FAPE and unlawful discrimination, G.U. is not receiving educational benefit.

***H.P.***

77. H.P. is six years old and has Autism Spectrum Disorder. She is currently placed in a primary autism classroom. She receives services in the general education classroom for thirty minutes in the morning and thirty minutes in the afternoon.

78. During the 2023-24 school year, CCSD denied H.P. a FAPE and discriminated against her in many ways, including, but not limited to, the following:

a. **Inadequate Behavioral Support**: Due to the lack of properly trained staff, CCSD did not administer an appropriate FBA and BIP. The FBA was not conducted using best practices or research-based methods, leading to a BIP that exacerbated H.P.'s behaviors instead of mitigating them.

b. **Non-implementation of the IEP:** The District failed to implement all components of H.P.'s IEP, which is essential for her educational progress.

c. **Improper Placement Decisions:** CCSD made placement decisions without basing them on H.P.'s IEP, excluded parental participation in these decisions, and neglected the LRE requirements.

d. **Parental Exclusion:** By refusing to permit a classroom observation, CCSD denied H.P.'s parents a meaningful opportunity to participate in her educational planning.

e. **Delayed Assessments:** The District unreasonably delayed responding to parental requests for an FBA and Occupational Therapy (OT) assessment, further hindering H.P.'s progress.

f. **Lack of Curriculum Exposure:** H.P. was not exposed to the core curriculum, impeding her academic development.

g. **Inconsistent Progress Reporting:** There were discrepancies between progress reports on goals and H.P.'s present levels of performance in her IEP. When parents sought data to substantiate these reports, the District failed to provide it.

h. **Lack of Appropriate Notice Prior to IEP Meeting:** The District issued prior written notice for an IEP meeting in March to go over the results of an OT assessment. Although the notice did not indicate that the IEP team would be discussing a change in placement, the meeting also addressed the amount of time H.P. would be in the general education setting. The resultant IEP reduced the amount of time H.P. spent in general education.

i. **Discriminatory Practices:** CCSD discriminated against students with disabilities by requiring parents of special education students to transport their children and serve as chaperones on field trips, as well as by providing a segregated Field Day activity for special education students and requiring parents to attend this activity with their child.

j. As a consequence of this denial of FAPE and unlawful discrimination, H.P. regressed behaviorally and made minimal academic progress, failing to meet the goals and objectives in her IEP.

79. During the 2024-25 school year, CCSD continues to deny H.P. a FAPE and discriminate against her in many ways, including, but not limited to, the following:

a. **Insufficient Support in General Education.** H.P.'s access to general education is limited due to a lack of adequately trained staff to support her in the LRE.

37

b. **Inadequate Assessments**: The District never conducted a reinforcer assessment to determine what would motivate H.P. to learn and remain engaged, rendering her IEP ineffective. Without such an assessment, the IEP failed to include supports necessary to be reasonably calculated to result in educational benefit for H.P.

c. **Lack of Research-Based Interventions**: Despite the general availability of effective research-based interventions to address behavioral needs, CCSD is unable to implement them due to insufficiently trained staff

d. **Inadequate Implementation of IEP:** The District cannot faithfully implement H.P.'s IEP. An Independent Educational Evaluation (IEE) recommended a Registered Behavior Technician as a 1:1 aide; instead, CCSD provides a Specialized Program Teacher Assistant lacking training in behavioral supports.

e. **Behavioral Concerns:** H.P. is already exhibiting concerning behaviors that are interfering with access to her educational programming.

f. **Non-implementation of the IEP:** The District failed to implement all components of H.P.'s IEP, which is essential for her educational progress.

g. As a consequence, H.P.'s IEP is not reasonably calculated to result in educational benefit and is, in fact, not providing educational benefit. Additionally, CCSD continues to deny H.P. reasonable accommodations and to discriminate against her.

### *K.S.*

80. K.S. is six years old and has severe debilitating anxiety disorder and panic disorder. She is currently placed in general education.

81. During the 2023-24 school year, the District failed to deliver a FAPE and discriminated against K.S. in many ways, including, but not limited to, the following:

a. **Failure to Evaluate for Special Education or Section 504 Eligibility.** K.S. was in kindergarten during the 2023-24 school year. Her classroom was so chaotic, without behavior supports for classmates who needed those supports, that K.S. developed an anxiety disorder. When she became scared due to adults yelling, feeling threatened by a classmate, or exposure to a chaotic school environment, the resulting anxiety caused her to wet herself in the classroom. Too afraid to tell any adult, she would sit in wet panties all day and developed sores from eczema as a result. Rather than evaluate K.S., the principal told A.S. to take K.S. to a behaviorist. The private provider told A.S. that K.S. did not have behavioral issues. Instead, she had anxiety. After A.S. told CCSD personnel of this diagnosis, they took no further steps to evaluate its impact on her educational programming.

b. **Inappropriate Programming**. Even though no Section 504 evaluation was completed, CCSD wrote several Section 504 plans for K.S., which required that A.S. come into the school to support her daughter.

c. **Failure to Implement Section 504 Plans**. K.S.'s principal wrote several Section 504 plans to address concerns raised by A.S. However, most of the time, school staff did not follow the Section 504 plans.

d. **Denial of Parental Participation and Retaliation**. After writing Section 504 plans that required A.S. to be the one to support K.S. in school, the principal banned her from the school on March 19, 2024. This was in retaliation for A.S.'s advocacy on behalf of her own children as well as other students with disabilities.

e. As a consequence of this denial of FAPE and unlawful discrimination, K.S. made no academic progress in kindergarten and actually regressed in some areas. Additionally, due to the retaliatory trespass notice, A.S. was forced to transfer her to a new school.

82. During the 2024-25 school year, the District is failing to deliver a FAPE and discriminated against K.S. in many ways, including, but not limited, to the following:

a. **Failure to Evaluate for Special Education Eligibility**. As a result of the inappropriate programming in kindergarten, A.S. filed a complaint with the United States Department of Education Office of Civil Rights. To resolve the complaint, CCSD agreed to conduct a special education evaluation of K.S. within forty-five school days of signing the resolution agreement. Within ten days of the start of the 2024-25 school year, CCSD had to meet with the Parents to develop an Individual Student Safety Plan. However, because CCSD has delayed in evaluating K.S., she began the year with no IEP in place.

b. As a consequence of this denial of FAPE and unlawful discrimination, K.S. is not currently receiving a program reasonably calculated to provide educational benefit.

*M.S.*

83. M.S. is nine years old and has dyslexia and colorblindness. He is currently placed in general education for all but 35 minutes of the day, when he goes to resource room.

84. During M.S.'s first four years in CCSD, the District failed to deliver a FAPE and discriminated against M.S. in many ways, including but not limited to the following:

a. **Failure to Identify M.S. as a Child in Need of Special Education.** Early in first grade, A.S. noticed that M.S. did not know any sight words. By October of first grade, M.S.'s teacher told A.S. was really struggling due to his lack of reading ability. A.S. discussed with the teacher and the principal having M.S. repeat kindergarten. CCSD personnel did not suggest evaluating M.S. for special education eligibility. When A.S. asked for M.S. to be tested for dyslexia, she was told that CCSD could not evaluate him until second grade. Instead, the principal told A.S. that M.S. would be caught up by the end of the year. Sometime after the mid-year holiday break, M.S.'s teacher told A.S. that he would not be caught up. At that point, the principal suggested retaining M.S. in first grade. Because M.S. had made friends, A.S. would not agree. CCSD did not evaluate him until the middle of second grade.

b. **Denial of Parental Participation**. A.S. does not recall attending the original IEP meeting in second grade. There were statements in the original IEP attributed to A.S. that she never would have made about M.S.

c. **Inappropriate Programming**. In third grade, M.S.'s IEP provided for pull-out instruction. However, he received no instruction when pulled out. Instead, he played games. M.S. began experiencing headaches and stomach aches and missing school due to illness. School refusal escalated.

d. **Discriminatory Treatment**. At the end of second grade, M.S. fell on the playground and broke his arm. CCSD would not allow him to attend summer programming because he had a broken arm.

e. **Failure to Implement Section 504 Plans**. M.S.'s principal wrote several Section 504 plans to address concerns raised by A.S. However, most of the time, school staff did not follow the Section 504 plans.

f. **Inappropriate IEP**.  A.S. filed a complaint with the United States Office of Civil Rights related to M.S.'s educational programming. CCSD agreed to resolve the dispute by convening an IEP meeting on or before August 30, 2024, to address all elements of M.S.'s IEP, with special consideration given, but not limited to, present levels of academic and functional performance, specially designed instruction, goals and benchmarks, and supplementary aids and services.

g. **Retaliation**. Because of A.S.'s advocacy on behalf of her own children as well as other students, the principal of M.S.'s school served A.S. with a notice of trespass on March 19, 2024, forbidding A.S. from entering school grounds. As a consequence, M.S.'s parents were forced to transfer their children to another school.

h. As a consequence of this denial of FAPE and unlawful discrimination, M.S. made no academic progress in his areas of need. Additionally, M.S. was forced to transfer schools because of retaliation against his mother.

85.   M.S. is currently at a new school where he is not experiencing many of the same difficulties. However, because of the district-wide policies and practices of CCSD outlined in ¶¶ 46-58, *supra*, at any point, M.S.'s situation could change, resulting in a loss of educational benefit. For example, CCSD regularly removes necessary trained personnel from its classrooms, due to staffing shortages. Even the best teachers are unable to comply with students' IEPs in under-resourced classrooms.

**L.B.**

86. L.B. is nine years old and has Autism Spectrum Disorder. He is currently placed in a primary autism classroom.

87. Prior to the 2024-25 school year, CCSD denied L.B. a FAPE in many ways, including, but not limited to, the following:

   a. **Failure to Provide Appropriate Assistive Technology.** L.B. was non-verbal when he entered CCSD in 2018-19. He was never assessed for assistive technology. He was supposed to have a picture book for communication, but it was not provided until kindergarten.

   b. **Failure to Implement IEP**. In the 2019-20 school year, L.B. did not receive his related service of speech until the second semester, as his speech therapist did not realize that he was on her roster. In the 2021-22 school year, A.B. noted large discrepancies between the communication log and minutes recorded for speech therapy.

   c. **Failure to Provide Appropriate Instruction.** During the 2020-21 school year, L.B. would not participate at all in virtual instruction or any related services.

   d. **Failure to Provide Appropriate Educational Setting and Behavioral Supports.** During the 2022-23 school year, L.B. had a permanent substitute in his primary autism class. It was a K-3 class and L.B. was paired with kindergarten students well below his skill level. He was frustrated when he had to return to the primary autism class and began acting out, throwing temper tantrums and taking off his clothes. CCSD did not complete an FBA and develop a BIP. CCSD refused parental requests to move L.B. to the 3-5 self-contained class so he would be closer in age to his peers.

   e. **Denial of Parental Participation and Failure to Educate in the LRE**. During the 2022-23 school year, CCSD failed to provide the daily

communication log required by L.B.'s IEP. The general education teacher had no contact with A.B. until late in the third quarter. At that time, the teacher told her that CCSD was not providing L.B. with his cool down chair in the general education classroom. She also advised that L.B. could stay longer in general education with a 1:1 aide. CCSD denied a parental request for a 1:1 aide, which would have allowed him to remain in general education for more of the day.

f. As a consequence of this denial of FAPE, L.B. regressed behaviorally and made minimal academic progress.

88. During the 2024-25 school year, CCSD continues to deny L.B. a FAPE in many ways, including, but not limited to, the following:

a. **Failure to Educate in the LRE.** L.B.'s time in the general education setting continues to be limited due to CCSD's refusal to support him in the LRE with a 1:1 aide.

b. **Failure to Provide Appropriately Trained Staff**. The instructor for L.B.'s primary autism class is a long-term substitute.

c. **Denial of Parental Participation**. Parent is not receiving the daily communication log, has not been advised of the name of L.B.'s general education teacher, and has not been contacted by the general education teacher.

d. **Denial of Related Services**. L.B. is refusing to engage in speech therapy and CCSD has not attempted to ascertain the reason for this refusal.

e. As a consequence, L.B.'s IEP is not reasonably calculated to result in educational benefit and is, in fact, not providing educational benefit.

***E.T.***

89. E.T. is fifteen years old and has Autism Spectrum Disorder, Disruptive Mood Disorder, ADHD, and Depression. He is currently in tenth grade, placed in general education 80% of the time.

90. Prior to the 2024-25 school year, CCSD denied E.T. a FAPE in many ways, including, but not limited to, the following:

a. **Failure to Provide Appropriate Behavioral Supports, Inappropriate Seclusion, and Denial of Parental Participation.** E.T. entered kindergarten in September 2014. For the 2014-15 through 2016-17 school years, due to

behaviors of concern, CCSD personnel repeatedly removed E.T. from the classroom and placed him in a separate room. No one informed A.B. of the seclusion. She learned when her daughter told her what was happening to E.T. at school. There are well-documented, research-based interventions to address behavior, but the District did not utilize them.

b. **Failure to Identify E.T. as a Child in Need of Special Education and Resultant Failure to Provide Appropriate Instruction**. Prior to the fall of 2016, CCSD was on notice that E.T. might need special education and related services. Notwithstanding that notice, CCSD failed to initiate an evaluation. This led to ineffective instruction and separation from E.T.'s general education peers. In 2016, the evaluation was delayed for several months. E.T. did not have an IEP in place until approximately December 2016.

c. **Failure to Provide Services**. Beginning in the 2016-17 school year, E.T. was hospitalized several times. CCSD failed to provide services during the hospitalizations.

d. **Unlawful Use of Restraints**. From 2017 through 2020, E.T. and his classmates were regularly restrained. CCSD never notified A.B. of the restraints.

e. As a consequence of this denial of FAPE, E.T. regressed behaviorally and made minimal academic progress.

91. E.T. is currently not experiencing the same difficulties that he has in the past. However, because of the district-wide policies and practices of CCSD outlined in ¶¶ 46-58, *supra*, at any point, E.T.'s situation could change, resulting in a loss of educational benefit. For example, CCSD regularly removes necessary trained personnel from its classrooms, due to staffing shortages. Even the best teachers are unable to comply with students' IEPs in under-resourced classrooms.

**Z.A.**

92. Z.A. is fourteen years old and has dyslexia, dysgraphia, dyscalculia, ADHD, and (most recently added) anxiety. For several reasons, including in part because CCSD has failed to provide appropriate educational programming, Z.A. attends a private school at her parents' expense.

43

93. As a toddler, Z.A. loved to explore and learn. Although her parents noted some language concerns, Z.A. exceeded all her physical and cognitive developmental milestones and was ready to take on the world, until school started.

94. Z.A. began kindergarten with the ability to write her name correctly. However, although her compensation skills were phenomenal, any work related to printed language was an intense struggle. She could not retain sight words. Homework involved avoidance, tears, hiding, tension, and frustration. At the end of Z.A.'s kindergarten year, A.A. quit her job as a teacher in order to support Z.A. at home.

95. In first and second grade, Z.A. had trouble hearing and isolating the sounds to correctly write words. Homework took hours. By second grade, the school identified her for RTI interventions. A.A. discussed concerns with school personnel to seek assistance to better meet Z.A.'s learning needs. However, because she was so intelligent and able to compensate, Z.A. earned good grades in spite of her inability to read and write adequately for her grade level. School personnel told A.A. that Z.A.'s skills would eventually "click" and did not evaluate her for special education. CCSD personnel told A.A. if she requested that Z.A. be tested for special education, the District would deny the request due to Z.A.'s good grades, test scores, and benchmark data.

96. The family pursued private interventions, which did not help. Z.A. was on a waiting list for roughly a year to get a neuropsychological evaluation and final report. When she was evaluated, at the age of eight, Z.A. was finally diagnosed with learning disabilities. Parents now had concrete data on her strengths and weaknesses and direction for how to address her educational needs. The District should have performed an evaluation years prior.

97. A.A., an educator, pursued online classes through the Dyslexia Training Institute. She realized that the balanced literacy practices in CCSD could not provide the appropriate

instruction for Z.A. In third grade, Z.A.'s parents requested that the District switch RTI interventions to a structured literacy approach as described in Nevada's dyslexia resource guide.

98. Z.A.'s parents offered to pay for a research-based intervention program that CCSD could implement. CCSD refused.

99. In the summer before Z.A.'s fourth grade year, her parents paid for the CCSD literacy strategist to take a local, in-person Orton-Gillingham training. As far as parents know, there was no change in instruction as a result. Z.A. did not participate in RTI in fourth grade because there was greater benefit to core grade level instruction for Z.A. rather than sitting through an ineffective intervention through RTI.

100.    When it became clear that CCSD would not appropriately program for Z.A., her parents were able to secure and pay for Orton-Gillingham tutoring outside of school. Eventually, after fifth grade, her parents enrolled Z.A. in private school, in part because the District could not meet her educational needs.

101. Z.A. had many supportive teachers in CCSD, but they did not have the training, resources or tools to provide an appropriate education to a child with dyslexia. Individual teachers could not make up for the fact that Z.A. never had the support of CCSD administration to follow the law to identify, properly support, and teach children like Z.A.

102. Had CCSD provided teacher training in appropriate methodologies for remediating dyslexia, as required by State law, it would have saved Z.A. years of remediation outside of school, so that she, like her classmates, could have enjoyed extracurricular childhood activities. She currently attends private school, in part due to CCSD's inability to meet her educational needs.

103. CCSD denied Z.A. a FAPE and discriminated against her in many ways, including, but not limited to, the following:

a. **Lack of Research-Based Interventions.** CCSD did not provide appropriate instructional methodologies to address Z.A.'s learning disabilities, even when her parents offered to fund training and interventions that would help Z.A. and other students with similar needs.

b. **Failure to Identify Z.A. as a Child in Need of Special Education**. CCSD failed to identify Z.A.'s learning disabilities, using a discredited "wait to fail" approach.

c. **Lack of Training in Research-Based Interventions.** Because CCSD does not train staff in effective research-based interventions, they were unavailable to her when she was enrolled in the District.

d. **Denial of Parental Participation**. A.A. advocated for Z.A. and provided information and resources that could have supported Z.A. and allowed her to receive adequate instruction under State law. Because CCSD administration refused to consider A.A.'s input, Z.A. did not receive appropriate programming.

e. As a consequence of this denial of FAPE and unlawful discrimination, Z.A. received inappropriate educational programming while within the District and her parents understandably have no confidence that she would receive appropriate programming if she returned to CCSD. This fact contributes to their decision to enroll her in private school.

## CLASS ACTION ALLEGATIONS

104. Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

105. Named plaintiffs bring this action on behalf of themselves and all others similarly situated, and seek class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(2) of all children who live within the jurisdiction of the Clark County School District and are receiving, or should be receiving, special education and related services under the IDEA.

106. Named plaintiffs seek to certify the following seven subclasses:

SUBCLASS 1: All children who are between the ages of three and twenty-two who live within the jurisdiction of CCSD and who are eligible for special education under IDEA

46

but whom CCSD has not located, evaluated, and identified as eligible for special education;

SUBCLASS 2: All children who are between the ages of three and twenty-two who live within the jurisdiction of CCSD and who are eligible for special education under IDEA under the eligibility category of specific learning disability and who are not receiving appropriate services and research-based interventions to address their needs related to the specific learning disability;

SUBCLASS 3: All children who are between the ages of three and twenty-two who live within the jurisdiction of CCSD and who are eligible for special education under IDEA under the eligibility category of autism and who are not receiving appropriate services and research-based interventions to address their needs related to autism;

SUBCLASS 4: All children who are between the ages of three and twenty-two who live within the jurisdiction of CCSD and who are eligible for special education and are not receiving appropriate behavioral supports as required by law;

SUBCLASS 5: All children who are between the ages of three and twenty-two who live within the jurisdiction of CCSD and who are eligible for special education and are not being educated in the least restrictive environment;

SUBCLASS 6: All children who are between the ages of sixteen and twenty-two who live within the jurisdiction of CCSD and who are eligible for special education and have not undergone a research-based transition assessment and/or who are not receiving appropriate transition services.

SUBCLASS 7: All children who are between the ages of three and twenty-two who live within the jurisdiction of CCSD and who have been unlawfully excluded from school for behavior that is a manifestation of their disability.

107. A class action is the only practicable means by which Named Plaintiffs and the subclass members can seek effective redress against Defendants for the claims in the instant action.

108. As set forth below, this action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a). This action also falls within Federal Rule of Civil Procedure 23(b)(2).  Certification of the Named Plaintiffs' claims for class-wide treatment is appropriate because Named Plaintiffs can prove the elements of their claims on a subclass-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

109. **<u>Numerosity</u>**.  Each subclass is so numerous that joinder of all members of the subclass is impracticable. As of CCSD's 2022-23 District Accountability Report, available at https://bit.ly/ccsd_2223, there were 304,276 students attending CCSD schools, 13.05% of whom (39,701) were classified with disabilities requiring special education and related services. The class members thus number approximately 40,000 individual students identified, or who should be identified, as students with disabilities each school year in CCSD.  Further, because of CCSD's unlawful policies, upon information and belief, thousands of children currently do not receive (1) timely evaluation for the purposes of offering special education and related services, (2) appropriate services to address specific learning disabilities, (3) appropriate services to address autism, (4) appropriate behavioral supports, (5) appropriate programming in the least restrictive environment, (6) appropriate transition services; and (7) appropriate manifestation determinations prior to being excluded from school.

110. Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

111. **<u>Commonality</u>**.  This action involves common questions of law and fact that predominate over any questions affecting individual members of the Classes.  All persons comprising the proposed classes are subject to the provisions of the IDEA, ADA and Section 504. There are questions of law and fact common to each subclass, namely:

   a.  Whether CCSD's policies, procedures, and practices related to location, evaluation, and identification of children eligible for special education services comply with IDEA.

   b.  Whether CCSD's policies, procedures, and practices related to location, evaluation, and identification of children eligible for special education services comply with Section 504 and the ADA.

c.   Whether CCSD's policies, procedures, and practices related to provision of services and research-based interventions to address the needs of students with specific learning disabilities comply with IDEA.

d.   Whether CCSD's policies, procedures, and practices related to provision of services and research-based interventions to address the needs of students with specific learning disabilities comply with Section 504 and the ADA.

e.   Whether CCSD's policies, procedures, and practices related to provision of services and research-based interventions to address the needs of students with autism comply with IDEA.

f.   Whether CCSD's policies, procedures, and practices related to provision of services and research-based interventions to address the needs of students with autism comply with Section 504 and the ADA.

g.   Whether CCSD's policies, procedures, and practices related to provision of behavioral supports comply with IDEA.

h.   Whether CCSD's policies, procedures, and practices related to provision of behavioral supports comply with Section 504 and the ADA.

i.   Whether CCSD's policies, procedures, and practices related to provision of services in the least restrictive environment comply with IDEA.

j.   Whether CCSD's policies, procedures, and practices related to provision of services in the most integrated setting comply with Section 504 and the ADA.

k.   Whether CCSD's policies, procedures, and practices related to provision of transition services comply with IDEA.

l.   Whether CCSD's policies, procedures, and practices related to provision of transition services comply with Section 504 and the ADA.

m.   Whether CCSD's policies, procedures, and practices related to provision of manifestation determination hearings comply with IDEA.

n.   Whether CCSD's policies, procedures, and practices related to provision of manifestation determination hearings comply with Section 504 and the ADA.

112. **Typicality**.  The claims of the named plaintiffs are typical of the claims of the subclass that they represent. All members of the proposed subclasses were similarly situated and comparably injured by Defendants' wrongful conduct. Because named plaintiffs and the proposed class members challenge CCSD policies related to special education, Defendants

likely will assert similar defenses to their claims. Further, the answer to whether CCSD policies violate the IDEA, ADA and Section 504 will determine the success of the claims of the named plaintiffs and every other proposed subclass member, and successful prosecution of these claims will benefit every other member of the proposed subclasses.

113. **Adequacy**.  The named plaintiffs will fairly and adequately represent the interests of each subclass they represent. They have no interests that are separate from, or antagonistic to, the subclass and they seek no relief other than declaratory and injunctive relief that will benefit all members of the subclass. Further, named plaintiffs are represented by counsel with significant experience with this type of litigation.

114. **Rule 23(b)(2)**. Class action status under Rule 23(b)(2) is appropriate because CCSD has acted or failed and/or refused to act on grounds that generally apply to the proposed Classes, such that preliminary and final injunctive and declaratory relief is appropriate and necessary with respect to each member of both Classes. Defendants have acted and continue to act on grounds generally applicable to each subclass, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each subclass as a whole.

115. **Superiority**.  The foregoing paragraphs amply demonstrate why this Class Action is superior to other available methods for fairly and efficiently adjudicating the controversy, which seeks systemic relief that will benefit all of the members of the respective classes equally.

116. **Rule 23(g)**.  Plaintiffs respectfully request that the undersigned counsel be appointed Class Counsel. The undersigned attorneys have experience in class-action litigation involving complex civil rights matter in federal court, and knowledge of the relevant statutory law, including specific experience relating to the IDEA, ADA and Section 504, and Defendants'

unlawful policies and practices. Counsel have the resources, expertise and experience to prosecute this action.

117. **Certification of Specific Issues: Fed. R. Civ. P. 23(c)(4)**.  To the extent that any described Class herein does not meet the requirements of Rules 23(b)(2), Plaintiffs seek the certification of issues that will drive the litigation toward resolution.

## COUNT I
## INDIVIDUALS WITH DISABILITIES EDUCATION ACT
## 20 U.S.C. § 1400, *et seq.*

118. Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

119. Each named and member of the plaintiff class is a child with a disability who is eligible for special education and related services under the IDEA. *See* 20 U.S.C. §§ 1401, 1412.

120. Defendant Clark County School District, as the LEA for the plaintiff class members, is responsible for the provision of a FAPE in the least restrictive environment. 20 U.S.C. § 1401(19), 20 U.S.C. § 1413(a). Defendant Dr. Brenda Larsen-Mitchell is the individual responsible for CCSD's compliance with IDEA.

121. Defendant Nevada Department of Education, as the SEA for the State of Nevada, is "primarily responsible for the State supervision of public elementary and secondary schools" and the provision of a free appropriate public education in the least restrictive environment to all eligible students. *See* 20 U.S.C. §§ 1401(32), 1412(a)(1), 1412(a)(5). Defendants NDE and Superintendent of Public Instruction Jhone Ebert are responsible for supervising and directing the services, programs, and activities of the Nevada Department of Education and for supervising all special education programs that are administered by any other state agency.

122. Defendants have violated 20 U.S.C. § 1400 *et seq.*, and its implementing regulations by:

    a.  failing to have in effect policies and procedures to ensure CCSD provides a FAPE in the LRE to all eligible children, 20 U.S.C. § 1412(a)(1); 34 C.F.R. § 300.101; 20 U.S.C. § 1416(a)(1)(C), (a)(3); 34 C.F.R. § 300.600;

    b.  failing to have in effect policies and procedures to ensure that CCSD identifies, locates, and evaluates all children with disabilities who are in need of special education and related services, 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.111;

    c.  failing to have in effect policies and procedures to ensure that IEPs are developed, reviewed, and revised in accordance with IDEA and include necessary components such as measurable annual goals, statements of the student's present levels of academic achievement, 20 U.S.C.  1414(d); 34 C.F.R. § 300.320(a);

    d.  failing to have in effect policies and procedures to ensure that IEPs for children with specific learning disabilities and autism include a statement of special education and related services and supplementary aids and services that is based on peer-reviewed research to the extent practicable, 34 C.F.R. § 300.320(a)(4);

    e.  failing to have in effect policies and procedures to ensure that CCSD educates all eligible children in the least restrictive environment, 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114;

    f.  failing to have in effect policies and procedures that address students' behavior and prevent the unlawful exclusion of students with disabilities due to behaviors that are a manifestation of their disabilities, 20 U.S.C. § 1415(k)(1)(E), (F); 34 C.F.R. § 300.530; and

    g.  failing to have in effect policies and procedures to ensure that students with disabilities receive appropriate transition services, 20 U.S.C. § 1401(34), 34 C.F.R. § 300.320(b).

## COUNT II
## AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. § 12132, *et seq.*

123. Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

124. Each named plaintiff and member of the plaintiff class is an "individual with a disability" within the meaning of the ADA. Their disabilities substantially limit one or more major life activities, including, but not limited to, learning, reading, concentrating, thinking, and communicating. 42 U.S.C. § 12102.

125. As school-age children who live in Clark County, each named plaintiff and member of the plaintiff class is qualified to participate in Defendants' educational programs and services. *See* 42 U.S.C. § 12131(2).

126. Defendant NDE is a public entity subject to Title II of the ADA. Defendant Jhone Ebert is the state official responsible for administering and/or supervising the Nevada Department of Education's services, programs, and activities for children with disabilities. 42 U.S.C. § 12131(1).

127. Defendant CCSD is a public entity subject to Title II of the ADA. Defendant Brenda Larsen-Mitchell is the official responsible for administering and/or supervising the CCSD's services, programs, and activities for children with disabilities.

128. By the acts and omissions alleged herein, Defendants have discriminated against the Named Plaintiffs and the Plaintiff class in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing regulations by, on the basis of disability:

    a. excluding the Named Plaintiffs and the Plaintiff class from participation in, and denying them the benefits of, a public education, and otherwise discriminating against them, 28 C.F.R. § 35.130(a);

    b. denying them an educational opportunity that is equal to the opportunity afforded other children, 28 C.F.R. § 35.130(b)(1)(ii);

    c. denying them educational services that are as effective as the services provided to other children, 28 C.F.R. § 35.130(b)(1)(iii);

    d. unnecessarily providing them different or separate educational services, 28 C.F.R. § 35.130(b)(1)(iv);

e.   aiding or perpetuating discrimination against them by providing significant assistance to CCSD even though it discriminates against these children on the basis of disability, 28 C.F.R. § 35.130(b)(1)(v);

f.   utilizing methods of administration that have the effect of subjecting them to discrimination on the basis of disability, have the effect of substantially impairing accomplishment of its objectives for students with disabilities, and perpetuate the discrimination of CCSD against these children, § 35.130(b)(3);

g.   failing to reasonably modify their policies, practices, or procedures as needed to avoid discrimination on the basis of disability, § 35.130(b)(7);

h.   failing to provide them educational services, programs, and activities in the most integrated setting appropriate to their needs, § 35.130(d).

129. CCSD regularly denies reasonable accommodations, including, but not limited to, provision of appropriate behavioral supports and appropriate instructional programming, to students with disabilities, despite being on notice that students need these accommodations. *See A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195 (9th Cir. 2016) (provision of appropriate behavioral supports is reasonable accommodation); *Rogich v. Clark Cnty. Sch. Dist.*, No. 2:17-cv-01541, 2021 U.S. Dist. LEXIS 19713 (D. Nev. Oct. 12, 2021) (provision of research-based reading instruction is reasonable accommodation).

130. Refusal to investigate the feasibility of providing these reasonable accommodations in light of explicit notice of the need for and availability of such accommodations amounts to deliberate indifference. *Rogich*, 2021 U.S. Dist. LEXIS 19713, at *27.

131. The relief sought by Plaintiffs and the Plaintiff class would not require a fundamental alteration to Defendants' programs, services, or activities.

### COUNT III
### SECTION 504 OF THE REHABILITATION ACT
### 29 U.S.C § 794

132. Plaintiffs reallege and incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

133. Each named plaintiff and member of the plaintiff class is an "otherwise qualified individual with a disability" within the meaning of Section 504. 29 U.S.C. §§ 794, 705(20),

134. As school-age children who live within Clark County, each named plaintiff and member of the plaintiff class is qualified to participate in Defendants' educational programs and services. 34 C.F.R. § 104.3(*l*)(2).

135. Defendant NDE is a recipient of federal financial assistance subject to Section 504. 29 U.S.C. § 794(b)(2)(B). Defendant Jhone Ebert is the state official responsible for administering and/or supervising the Nevada Department of Education's services, programs, and activities for children with disabilities.

136. Defendant CCSD is a recipient of federal financial assistance subject to Section 504. 29 U.S.C. § 794(b)(2)(B). Defendant Brenda Larsen-Mitchell is the official responsible for administering and/or supervising the CCSD's services, programs, and activities for children with disabilities.

137. By the acts and omissions alleged herein, Defendants have discriminated against the Named Plaintiffs and the Plaintiff class in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. §794, and its implementing regulations by, solely on the basis of disability:

    a.  excluding the Named Plaintiffs and the Plaintiff class from participation in, and denying them the benefits of, a public education, and otherwise discriminating against them, 34 C.F.R. § 104.4(a);

    b.  failing to provide them with a free appropriate public education, including special education and related aids and services that are designed to meet their needs as adequately as the needs of nondisabled children are met and that adhere to the procedural safeguards set forth in Section 504, 34 C.F.R. § 104.33;

    c.  denying them an educational opportunity that is equal to the opportunity afforded other children, 34 C.F.R. § 104.4(b)(1)(ii);

    d.  denying them educational services that are as effective as the services provided to other children, 34 C.F.R. § 104.4(b)(1)(iii);

 e. unnecessarily providing them different or separate educational services, 34 C.F.R. § 104.4 (b)(1)(iv);

 f. utilizing methods of administration that have the effect of subjecting them to discrimination on the basis of disability, have the effect of substantially impairing accomplishment of its objectives for students with disabilities, and perpetuate the discrimination of local school districts against these children, § 34 C.F.R. §104.4(b)(4); and

 g. failing to serve them alongside their nondisabled peers in academic and nonacademic settings to the maximum extent appropriate, § 104.34.

138. CCSD regularly denies reasonable accommodations, including, but not limited to, provision of appropriate behavioral supports and appropriate instructional programming, to students with disabilities, despite being on notice that students need these accommodations. *See A.G., supra*; *Rogich, supra*.

139. Refusal to investigate the feasibility of providing these reasonable accommodations in light of explicit notice of the need for and availability of such accommodations amounts to deliberate indifference. *Rogich*, 2021 U.S. Dist. LEXIS 19713, at *27

140. The relief sought by named plaintiffs and the plaintiff class would not require a fundamental alteration to Defendants' programs, services, or activities.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

 A. Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23;

 B. Declare that Defendants have violated the Individuals with Disabilities Education Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

 C. Permanently enjoin Defendants from subjecting the named plaintiffs and plaintiff class to policies and practices that violate their rights under the Individuals with

Disabilities Education Act, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

D.    Order Defendant NDE to develop, adopt, and implement policies and practices that will ensure that the State of Nevada and CCSD provide a free appropriate public education in the least restrictive environment to all eligible children within CCSD;

E.    Order Defendant NDE to develop, adopt, and implement policies and practices to ensure the State of Nevada and CCSD do not discriminate against students on the basis of disability;

F.    Appoint a Monitor to oversee Defendants' development, adoption, and implementation of policies and practices to ensure that the State of Nevada and CCSD provide a free appropriate public education in the least restrictive environment to all eligible children within CCSD and do not discriminate against students on the basis of disability;

G.    Order Defendants to comply with the Monitor's directives to develop, adopt, and implement policies that will provide a free appropriate public education in the least restrictive environment to all eligible children within CCSD and do not discriminate against students on the basis of disability;

H.    Award Plaintiffs reasonable costs, attorney's fees, and expert fees incurred in this action; and

I.    Grant any such other relief as the Court deems just, necessary, and proper.

**Attorneys for Plaintiffs**

/s/ Lori C. Rogich
Lori C. Rogich, Esquire
Nevada State Bar No. 12272
ROGICH LAW FIRM, PLLC
11920 Southern Highlands Parkway, Suite 301
Las Vegas, Nevada 89141

702.279.2491
lori@rogichlawfirm.com

Hillary D. Freeman, Esquire*
NJ ID No. 002362006
PA ID No. 200109
FREEMAN LAW OFFICES, LLC
100 Canal Pointe Blvd, Suite 121
Princeton, New Jersey 08540
609.454.5609
hillary@freemanlawoffices.com

Judith A. Gran, Esquire*
PA ID No. 41034
Catherine Merino Reisman, Esquire*
PA ID No. 57473
NJ ID No. 035792000
NY ID No. 5640172
REISMAN CAROLLA GRAN & ZUBA LLP
19 Chestnut Street
Haddonfield, New Jersey 08033
856.354.0071
catherine@rcglawoffices.com

Jeffrey I. Wasserman, Esquire*
NJ ID No. 037051999
NY ID No. 3046448
Gregory G. Little, Esquire*
NY ID No. 4288544
WASSERMAN LITTLE LLC
1200 Route 22 East, Suite 200, #2238
Bridgewater, New Jersey 08807
973.486.4801
jwasserman@wassermanlittle.com
glittle@wassermanlittle.com

*Pro hac vice motions forthcoming